15669

SEAY v. SOUTHERN RAILWAY—CAROLINA DIVISION

(31 S. E. (2d), 133)

164

*Messrs. Daniel & Russell,* of Spartanburg, S. C., Counsel for Appellant,

*Messrs. Carlisle, Brown & Carlisle,* of Spartanburg, S. C., Counsel for Respondents,

August 1, 1944.

Mr. Associate Justice Fishburne delivered the unanimous Opinion of the Court:

This appeal brings up for review issues growing out of a collision which occurred about 3:30 o'clock p. m., on August 29, 1942, at a railroad crossing in the City of Spartanburg, resulting in the death of plaintiff's decedent, Joe Walter Seay. The action was brought on behalf of his surviving widow and two minor children, to recover damages for wrongful death. Casualty Recriprocal Exchange, the insurance carrier of Palmetto Motor Express Lines, by whom the decedent was employed as a truck driver, was made a co-plaintiff because it had paid an award under the Workmen's Compensation Act for the benefit of the widow and children. In the course of the trial the defendant, Southern Railway—Carolina Division, was eliminated from the case by order of the trial Judge, which left as the sole defendant Charleston & Western Carolina Railway Company.

The accident occurred at the railroad crossing on West Main Street, which is also U. S. Highway No. 29. This street runs upon a course due east and west, and the railroad extends across it due north and south.

The deceased at the time of the accident was driving a motor truck on West Main Street on a down grade, proceeding from the east toward the crossing. The vehicle was owned by Palmetto Motor Express Lines, and was composed of a tractor and trailer with an overall length of 30 feet. It was heavily loaded with baled cotton goods, and the trailer was approximately the size of a railroad box car. As the truck approached the intersection there was also approaching the crossing from the north on the railroad, an engine pushing two gondola freight cars loaded with scrap iron. The truck collided with the side of the front gondala car near its forward end, causing the death of Seay, the driver.

The specifications of negligence submitted by the Judge to the jury include: (a) failure to flag the crossing as re-

quired by the ordinance of the City of Spartanburg; (b) failure to give the statutory crossing signals; (c) failing to maintain a proper and reasonable lookout while backing the train over a street crossing; (d) failing to give timely warning; (e) backing gondola cars which suddenly emerged from behind a building; (f) failing to stop the train after it appeared, or by due diligence should have appeared, to the persons in charge of the train that its continued movement would result in endangering the person or life of Seay, the truck driver. The complaint alleged that the negligence of the appellant was a direct and proximate cause of the death of Seay.

The appellant entered a general denial, and set up in addition thereto the affirmative defense of contributory negligence and gross contributory negligence. The particulars embraced in this defense are, generally, that the decedent knowlingly, negligently, and willfully drove a heavily loaded truck, with defective brakes or no brakes, down grade on to a railroad crossing with which he was familiar, and without keeping a proper lookout for trains; that decedent knew that he could not bring the truck to a stop by use of defective brakes; and failed to take the slightest care for his own safety. It is alleged that he disregarded the statutory signals and the signals of the flagman at the crossing, although the train was within his plain view when he was at least a hundred yards from the crossing.

The trial Judge upon motion eliminated punitive damages from the case, and the trial resulted in a verdict against the appellant in the sum of $5,000.00, actual damages. The appeal is from the refusal of the Court to grant appellant's motions for a nonsuit and directed verdict based upon decedent's contributory negligence and gross contributory negligence, and its freedom from actionable negligence.

Plaintiff's decedent was a young man, a resident of Spartanburg, and was familiar with West Main Street and the

railroad crossing in question. He was an experienced truck driver, and had been employed for years in this line of work.

The evidence shows that two or three hours prior to the accident, while at Gaffney, 20 miles from Spartanburg, he telephoned his employer at the latter city that he was having brake trouble; that the hose unit connecting with the vacuum brakes had pulled over on the exhaust pipe, and that a hole had been burned in it. He was told by the manager with whom he talked at Spartanburg, that another hose connection was being sent to him, and that he must not move the truck until the brakes were fixed. The new unit was immediately sent to Gaffney by another employee of the Palmetto Motor Express Lines. This employee did not testify at the trial because he was away in the army. Immediately after the collision, which occurred two or three hours subsequent to the dispatch of the hose connection, the manager of Palmetto Motor Express Lines discovered a hose connection lying beside the truck trailer, half burned up, but he could not say whether this was the defective piece or the new connection which had been sent to the driver.

Leaving Gaffney, Seay drove the truck to Spartanburg. He entered the city on its east side on West Main Street, drove through the city toward the west, and reached the intersection made by Morgan Avenue with West Main Street—one block from the crossing. He was then upon a down grade, with the railroad crossing about 300 yards away. When the truck had covered about 200 yards of this distance the attention of persons on each side of the street was drawn to it by the loud noise of scraping gears. They saw the driver bending forward and raising up in an excited manner, and frantically trying to shift his gears and pull up the brakes.

Mr. Kimes, a witness for the defendant, who was an employee of Service Oil Company, which is located on the south or left side of West Main Street as you approach the crossing, and 93 yards therefrom, saw the truck pass in front of

his oil station; he saw Seay trying to change gears, "and from the noise he was making with the gear shift, tried to slow down." He said that as the truck passed, he looked westward to the railroad and saw the front or lead gondola car just entering the street crossing from the north. We may say parenthetically that the warehouse of Montgomery Ward & Company, located on the north side of West Main Street, and flanking the railroad on the east, completely obstructed any view of a train coming from the north to a traveler going west, until it emerged into the street from behind the warehouse. This witness did not observe whether there was a flagman at the crossing. He stated that he was interested in observing the driver of the truck, "'because I could see there was trouble ahead for him." He, as did the other witnesses, estimated the speed of the truck at 10 or 15 miles per hour.

West Main Street is 40 or 50 feet in width; it is a heavily traveled four lane highway, and the truck occupied the right center lane. The witness, Kimes, said that after the truck passed the Service Oil Company and was within about 45 yards of the crossing, it cut sharply to the left in an attempt to enter a ramp or driveway leading from West Main Street, but two children were standing upon the sidewalk at the entrance to the driveway, and in order to avoid striking them, the driver cut back to his right. He then veered to his left again, and collided at an angle with the side of the front gondola car at its forward end, near or on the sidewalk on the south side of the street. At the time of the collision the gondola cars were all the way across the street, and it appeared to this witness that in making his last turn to the left, immediately prior to the collision, Seay attempted to pass between the train, on his right, and a signal standard imbedded in concrete, on his left. The train proceeded 25 or 30 feet after the collision before stopping, although the front wheels of the leading gondola car were derailed and astraddle the rail next to the truck. When all

movement ceased, the truck and gondola car were parallel and abreast. The large trailer part of the truck assembly was still upright, but wedged and crushed between the front gondola car and the metal signal standard; and the cab ahead was pushed over on its left side.

As a result of the impact, or the forward grinding movement thereafter, the exposed mouth or outlet to the gasoline tank under the truck driver's seat which projected toward the gondola car, was broken, resulting in gasoline flooding the cab, and within a few seconds after the collision the cab caught on fire. The driver succeeded in breaking through the glass of the cab door, and as he hung in flames over its edge, bystanders, including some of the witnesses in this case, pulled him out and took him to a hospital, where he died within five or six hours. There is testimony to the effect that Seay made a statement prior to his death that his truck ran into the train because his brakes failed to hold. There is no evidence that the decedent received any physical injury from the impact or collision. He died from third degree burns which extended over his entire body.

We here quote a portion of Kimes' testimony, which is similar in content to the evidence given by other witnesses for the plaintiff and the defendant:

"Q. And when you saw the train you say the front or lead gondola was just entering the street? A. Yes, sir.

"Q. Just coming out from behind the warehouse? A. Yes, sir.

"Q. And you were looking down and saw it come out? A. Yes, sir.

"Q. You did not see any flagman? A. I did not notice one.

"Q. And when you saw the railroad car come out from behind the warehouse where was the truck? A. Directly in front of our station, and I turned to the left and saw the train.

"Q. How far had the truck gone by that time? A. Ten to fifteen feet.

"Q. Nearing the crossing? A. Yes, sir.

"Q. And it was in plain view as the lead car came out that the truck was in trouble? A. Yes, sir.

"Q. Was there anything to prevent the flagman, if there was one, from seeing that it was in trouble? A. I do not know.

"Q. He could not see if he was in the middle of the street? A. I suppose so.

"Q. How far below this station was this driveway where the children were? A. I would judge half way between the station and the crossing.

"Q. When that lead car came out from behind the warehouse, how long was it before he headed to the driveway? A. I imagine the time he saw it he saw he was in trouble. He knew he was in trouble when I saw him first."

Mr. Crow, a witness for the plaintiff, was standing on the north side of West Main Street near the corner of Ezell Street, one door removed from the Montgomery Ward building. In this position he saw the gondola car of the train when it first emerged from behind the warehouse, and he saw the flagman on the west side of the track near the center of the crossing, flagging the train. As the front of the leading gondola car reached the flagman, he mounted it from the west side, and the car then obstructed the flagman's view of West Main Street to the east—the direction from which the truck was coming. This witness stated that when he first saw the gondola car backing out from behind the warehouse, the truck was between 30 and 35 yards from the crossing, and going about ten miles an hour. He witnessed the frenzied efforts of the driver to shift his gears and pull up the brakes. He saw the truck swerve to the left in the effort to enter the ramp on the south side of the street, and saw it cut back to the right in order to avoid hitting the children standing on the sidewalk. And then in the last few

seconds before the collision he saw the truck cut to the left again and collide with the front part of the gondola car just as they both reached the sidewalk to the south. From that point, the truck and gondola car moved with each other, and seemed to be "clinging together." The cab came to rest on its left side, after which it blazed up. Mr. Crow said that while the flagman was standing in the center of the street, and before he climbed on to the gondola car, there was nothing to prevent him from seeing the oncoming truck.

Another witness for the defense, Mr. Netherton, in his place of business on the south side of the street, and about a hundred yards from the crossing, saw the truck pass his place headed for the crossing, and the flagman in the middle of the street. He heard the gears of the truck scraping, and saw that the driver looked frightened as he endeavored to shift gears.

The engineer in his place in the cab had no actual sight of West Main Street to the east. He was on the right-hand side of his cab facing the west, watching the flagman, and did not know there had been a collision until after the flagman was knocked off the front of the gondola car on the south side of the crossing, by the force of the impact. The warehouse, to which reference has been made, completely obstructed the vision of the engineer to the east.

The flagman stated that he preceded the backing train as far as the middle of the crossing, where he stopped and flagged traffic. He said he first saw the truck at the Morgan Avenue intersection, 300 yards away; that just before he mounted the front of the gondola car as it reached him in the middle of the street, he again saw the truck,—just a little bit nearer, but still nearly 300 yards away. Having climbed upon the gondola car on the west side of the track, he saw nothing more of the truck, but the collision occurred before the gondola car had gone 25 feet. He denied that the truck driver appeared to be in any difficulty at the time he saw the truck. But we may note here that according to the

testimony of the other witnesses, the dangerous position of the driver did not develop until he came within 100 yards of the crossing.

The evidence shows that the train, consisting of an engine and two gondola cars, could have been stopped in three, four, or five feet after the engineer received an emergency signal. There was conflicting evidence as to whether the statutory signal was given at the crossing. At the close of the testimony, the jury was taken to the West Main Street crossing, and viewed the scene.

An ordinance of the City of Spartanburg introduced in evidence, provides: "It shall be the duty of any railway company operating any engine or train on the tracks of the Charleston & Western Carolina Railway Company across West Main Street, to send a flagman to the center of the street crossing before such train or engine enters the same, and flag said crossing while said train or engine is crossing West Main Street."

In connection with its affirmative defense of contributory negligence and contributory gross or willful negligence, the appellant relied upon common-law principles, the crossing statute, Code Sec. 8377, and the statutory enactment with reference to brakes. Code Section 1623 provides that every motor vehicle other than motorcycles when operated upon the highway shall be equipped with brakes adequate to control the movement of and stop and hold such vehicle, including two separate means of applying the brakes. There was testimony that the truck could have been stopped and the collision averted if the truck had been equipped with adequate brakes. Appellant contends that this section was violated, in that the brakes of the truck at the time of the collision were defective and inadequate and known to be so by plaintiff's intestate.

The first question to be considered is that of actionable negligence on the part of the appellant. Was there a total failure of proof of actionable negligence on the part of ap-

pellant operating proximately to cause the injury and death of plaintiff's intestate?

We think it was a question for the jury to determine as to whether or not this railroad crossing was properly flagged, and whether ordinary care was exercised in maintaining a proper lookout. The testimony shows that the flagman, when the leading gondola car had been pushed halfway across the street, mounted its west side and had no further view of the east side of West Main Street, from which the truck was approaching. It was for the jury to say whether due care was exercised in stopping the train, or at least in checking its speed. It is reasonably inferable that if it had either been stopped or its speed checked when the flagman saw or should have seen, in the exercise of due care, the peril of the truck driver, he could safely have passed over the crossing.

Appellant contends that the contributory negligence or gross negligence of the truck driver constituted the direct and proximate cause of his injury and death. It is argued that the sole and efficient cause of the accident was the negligence of the decedent in driving a heavily loaded truck down grade, knowing that it had no brakes, or inadequate brakes; that if the truck had been properly equipped with the brakes prescribed by law, it could have been stopped short of the crossing and the collision avoided.

It is well settled that the injured person's negligence, in order to bar a recovery, must have contributed as a proximate cause to the injury. It should be emphasized that negligence is contributory in a legal sense only where it contributes proximately to the injury. If the negligence of plaintiff's decedent operated only remotely and not proximately to cause the injury, the plaintiff is not barred of redress. This principle was made clear by this Court in *Bodie v. Charleston & W. C. R. Co.*, 61 S. C., 468, 39 S. E., 715, 720. In that case the Court had this to

say: "In 7 Enc. Law (2d), pp. 383-385, the rule is stated—and, we think, correctly, after investigation—as follows: 'A want of ordinary care may be said to contribute proximately to an injury when it is an active and efficient cause of the injury in any degree, however slight, and not the mere condition or occasion of it. But, it is not a proximate cause of the injury when the negligence of the person inflicting it is a more immediate, efficient cause. And so when the negligence of the person inflicting the injury is subsequent to and independent of the carelessness of the person injured, *and ordinary care on the part of the person inflicting the injury would have discovered the carelessness of the person injured in time to avoid its effect and prevent injuring him,* there is no contributory. negligence, because the fault of the injured party becomes remote in the chain of causation. In such a case the want of ordinary care on the part of the injured person is held not a judicial cause (*i. e.,* a proximate cause) of his injury, but only a condition of its occurrence. Conversely, when the carelessness of the person inflicting the injury is antecedent to the negligence of the person injured, and the latter might, by ordinary care, have discovered the failure of the former to use such care in time to avoid the injury, there can be no recovery, because the intervening negligence of the injured person is the direct and proximate cause of the injury.' This statement of the rule is not an exception to, or modification or qualification of, the doctrine of contributory negligence, but is only an illustration of that doctrine, which requires that, in order to constitute contributory negligence, the injured person's negligence must directly and proximately cause the injury, combining and concurring with the negligence of the injuring party. *Farley v. [Charleston Basket &] Veneer Co.,* 51 S. C. [222], 236, 28 S. E., 193, 401; *Disher v. [South Carolina & G.] R. Co.,* 55 S. C. [187], 192, 33 S. E., 172." (Emphasis added.)

It will be noted that the rule constitutes no exception to the general doctrine of contributory negligence, and does not permit one to recover in spite of contributory negligence. It merely operates to relieve the negligence of a plaintiff, which would otherwise be regarded as contributory, from its character as such. This is accomplished by characterizing the negligence of a defendant, if it intervenes between the negligence of the plaintiff and the accident, as the sole proximate cause of the injury, and the plaintiff's antecedent negligence as a condition or remote cause.

It was doubtless in the light of the foregoing rule that the Court in *Fletcher v. South Carolina & G. E. R. Co.*, 57 S. C., 205, 35 S. E., 513, 514, approved the following charge to the jury: " 'That should the jury believe that Clark Ely, the driver of the wagon, was negligent in driving upon the railroad track without having used proper efforts to discern the approach of the train, yet if the engineer of the train did see him in a position of peril and danger, or could have seen him by the exercise of due diligence, it was the duty of said engineer to use reasonable and practicable means to stop the train or prevent injury; and if he failed to do so, and from such failure the injury occurred, the defendant would be liable.' "

To the same effect see *Disher v. South Carolina & G. R. Co.*, 55 S. C., 187, 33 S. E., 172 and *Sauls v. D. W. Alderman & Sons Co.*, 55 S. C., 395, 33 S. E., 467.

The same principle is again referred to with approval in *Lee v. Northwestern R. Co.*, 89 S. C., 274, 71 S..E., 840.

In *Leppard v. Southern R. Co.*, 174 S. C., 237, 177 S. E., 129, where the deceased, lying on a railroad track, was hit by a train, an instruction which was held not prejudicial to defendant permitted recovery on the assumption that the accident would have been avoided if a proper lookout had been kept.

In the recent case of *Melton v. Atlantic Coast Line R. Co.*, 206 S. C., ..., 27 S. E. (2d), 490, wherein the alleged in-

jury was suffered by the plaintiff at a railroad crossing, the Court held that it was for the jury to say whether or at what time the engineer discovered or should have discovered that the injured motorist did not see the train, and whether the engineer with proper care could have slowed down and have given the motorist the opportunity to avoid the collision.

Of course discovery of the danger by the defendant, or a ··'y to discover it in the exercise of due care, includes a duty under the circumstances to appreciate the peril in time to take the steps necessary to avert the accident. In the case at bar, appellant was under the exacting duty not only under the common law, but under the municipal ordinance, to exercise due diligence in keeping a proper lookout at the railroad crossing, and to properly flag it. It is doubtless true, as argued by appellant, that the statutory warnings, namely, the blowing of the whistle or the ringing of the bell, would not have availed to stop the truck. And neither could the flagman by a mere perfunctory flagging have stopped it. But the flagman was not at the crossing merely for the purpose of giving warning to highway travelers of the approach of the train. It was his duty, in the reasonable exercise of care, to use all practicable means to stop the train, if by stopping it an accident could have been avoided, after discovery of the danger.

It was properly a question for the jury to determine whether the flagman saw or should have seen, in the exercise of ordinary care, the peril of the approaching truck, and whether there was time under the circumstances to appreciate the danger and to stop the train or check its speed, thus leaving an opening at the crossing for the truck to pass through.

By the verdict of the jury, it is evident that it concluded that the flagman was negligent in the discharge of his duty, and that his negligence, being the last or ultimate negligence, constituted the direct and proximate cause of Seay's death.

Appellant argues that plaintiff's decedent was guilty of gross or contributory negligence in that he violated the statutory law with reference to brakes. We have in the forepart of this opinion reviewed the evidence relating to the brakes on the truck driven by plaintiff's decedent. The law provides that motor vehicles be equipped with adequate brakes, and that the same shall be maintained in good working order.

As we view the evidence, it was for the jury to determine whether or not the statute had been violated by the deceased. Furthermore, the violation of a statute, although declared negligence *per se,* must be shown to have been the proximate cause of the injury. *Jeffords v. Florence County,* 165 S. C., 15, 162 S. E., 574, 81 A. L. R., 313. While at Gaffney two or three hours before the accident, he had telephoned for a new hose connection with which to repair the brakes. The necessary hose connection was sent to him, and he was told not to operate the truck until the brakes were fixed. It is true that after the accident and just before his death, according to evidence for the appellant, the decedent stated that he collided with the train because his brakes failed to work, but we do not think from this and the other pertinent evidence in the case, that he should be held guilty of gross contributory negligence as a matter of law merely because his brakes proved ineffective at the critical moment before the collision. See Annotations, 14 A. L. R., 1339, 63 A. L. R., 398.

It cannot be assumed as a matter of law that the brakes had not been fixed. The jury could reasonably have inferred that the brakes had suddenly failed to work 100 yards from the crossing, as the truck descended the down grade. The evidence tends to show that the driver made a frantic effort to apply his brakes. The circumstance that the decedent did not jump from the truck, which most of the witnesses say was traveling at a speed of about ten miles an hour, could authorize the inference that he believed the brakes were only

momentarily inoperative, but would become effective by continuing to manipulate them in the usual way.

It may also be reasonably inferred that if those in charge of the train had been alert and alive to their duty in the exercise of due care, the train might have been stopped in a shorter distance than 25 to 30 feet after the impact and thus have averted the injury and death of plaintiff's decedent. It will be recalled that the cab did not catch fire until after the truck had been pushed this distance.

In our opinion, the trial Judge committed no error in submitting to the jury for its determination the issues of actionable negligence, contributory negligence, and gross contributory negligence.

After the rendition of the jury's verdict, the appellant moved the Court for judgment, notwithstanding the verdict, on the same grounds advanced in its motions for nonsuit and directed verdict. In due time the motion was heard and overruled by the trial Judge in a comprehensive order, in which among other things, he reviewed the evidence, the issues, and the principles of law which he deemed applicable. In the process of agreeing on the transcript for appeal the respondent proposed that this order of the trial Judge be incorporated. The appellant disallowed the proposal, and when the matter was submitted to the trial Judge an order settling the case was filed without requiring the printing of the order. The respondent has appealed, and has caused the order to be printed as an appendix to the record.

A similar situation was presented in the case of *Able v. Pilot Life Insurance Co.,* 186 S. C., 26, 194 S. E., 628, where the Court held that it was unnecessary to print in the record on appeal the order of the Circuit Judge refusing a new trial, because a consideration of it was not necessary to a decision of the matters presented by the appeal.

Appellant presented no exceptions to the order of the trial Judge. The appeal to this Court does not refer to it, and a consideration of the order is in no

sense necessary in passing upon the issues presented. The respondent must, therefore, pay for the printing of such order in the transcript of record.

Judgment affirmed.

MR. CHIEF JUSTICE BAKER and MESSRS. ASSOCIATE JUSTICES STUKES and OXNER concur.

MR. ASSOCIATE JUSTICE TAYLOR did not participate.