16859

MILLER v. ATLANTIC COAST LINE R. CO. *ET AL.*
(81 S. E. (2d) 335)

*Messrs. Hagood, Rivers & Young,* of Charleston, *for ap-pellant,*

*Messrs. G. M. Howe, Jr.* and *Legare & Hare,* of Charleston, *for Respondent,*

April 14, 1954.

LITTLEJOHN, Acting Associate Justice.

This is an action for wrongful death of George Miller, who is plaintiff's intestate, and is brought under the wrongful death statutes against the defendants Atlantic Coast Line Railroad Company and its engineer, C. W. Douan, Jr.

The complaint alleges that the deceased, who was intoxicated at the time, was utilizing the parallel pathway to the east of the Atlantic Coast Line tracks just south of the Silver Hill path and was proceeding over said tracks when he slipped, stumbled and fell between the rails of the western (or south-bound) track of the defendant company and was lying there in a helpless condition and in a position of peril when a yard Diesel engine with a cut of three empty gondola cars, operated by the agents and servants of the defendants, ran over the plaintiff's intestate in plain view and killed him, the third car striking his head.

The specifications of negligence are contained in paragraph Twelfth of the complaint, as follows:

"That the death of plaintiff's intestate was directly and proximately caused by the joint and concurrent negligence, recklessness, wilfulness and wantonness of the defendants, their agents and servants as aforesaid, in the following particulars, to-wit:

"(a) In failing and omitting to maintain a proper and adequate lookout for pedestrians in, upon and near the railroad tracks upon which the engine and cut of cars were operated.

"(b) In failing and omitting to exercise due care in the operation of said engine and cut of cars so as to have observed plaintiff's intestate upon the railroad tracks upon which said train was traveling.

"(c) In failing and omitting to have slackened the speed of said train when plaintiff's intestate was seen upon the tracks on which the said train was traveling, or by the exercise of ordinary care should have been seen.

"(d) In failing and omitting to have the train of the defendant company under proper control.

"(e) In failing and omitting to have stopped the train after plaintiff's intestate was seen on said tracks.

"(f) In driving and operating said train into and against the body of plaintiff's intestate, thereby causing his death, when by the use of ordinary care the perilous position in which plaintiff's intestate was situate was known, or by the exercise of ordinary care should have been known by the operator thereof.

"(g) In driving and operating said train without maintaining a proper lookout to the front down the railroad tracks which were known to be heavily traveled by pedestrians, without using the slightest care to observe the presence of pedestrians on said tracks upon which said train was traveling.

"(h) In failing and omitting to exercise ordinary care so as to have discovered the helpless and perilous position in which plaintiff's intestate was situate.

"(i) In failing and omitting to have the said train equipped with proper and responsive brakes, or if the same was so equipped, in failing and omitting to apply said brakes after plaintiff's intestate was seen in a perilous position, or by the exercise of ordinary care could have been seen on the tracks ahead.

"(j) In driving and operating said engine and cut of cars down a railroad track which was constantly used by pedestrians without exercising the slightest care to observe the presence of plaintiff's intestate on said track in a helpless condition and in a position of peril.

"(k) In failing and omitting to have the engine and cut of cars under proper care and control so as to have stopped the same after plaintiff's intestate was seen, or by the exercise of ordinary care could have been seen, on the tracks ahead.

"(l) In driving and operating the engine and cut of cars in such a wilful and heedless manner as to run into plaintiff's intestate after he was seen on the tracks, and not to bring said train to a stop until after the entire cut of cars had passed over plaintiff's intestate's body for some distance.

"(m) In failing and omitting to give the statutory signals by bell or whistle while running the train over the crossing aforesaid.

"(n) In failing and omitting to give warning to plaintiff's intestate of the presence of said train by bell or whistle after he was seen in a helpless condition on said track."

It should be noted that all specifications of negligence in the complaint are directed against both "defendants, their agents and servants." This charges negligence to the railroad company's employees other than employee-defendant Douan.

The two defendants filed a joint answer denying the material allegations of the complaint, setting up that plaintiff's intestate was a trespasser, and the defenses of contributory negligence, recklessness, and wilfulness, "in that plaintiff's intestate, who was intoxicated and who was a trespasser on the right of way of defendant railroad, placed himself on the tracks of the defendant railroad in a position where the defendants could not see him in time to avoid the collision which was made inevitable by the negligent and reckless conduct of plaintiff's intestate."

The matter came to be tried before the Circuit Court and a jury resulting in a verdict of $16,000.00 actual damages against the defendant Atlantic Coast Line Railroad Company only. Timely motions for a non-suit, directed verdict, and for judgment notwithstanding the verdict were made and refused.

The verdict in favor of the defendant Engineer Douan of course absolves him of any wrongdoing, and any specifications of negligence as to him will be considered as not proved. The trial judge ruled out as a matter of law all specifications as to both defendants as relates to the statutory requirements to ring a bell or sound a whistle, their being no proof of failure to comply with the statute.

This appeal raises six questions as taken from appellant's brief, as follows:

"Question I: Are there any allegations in the complaint supported by testimony that will support a verdict against the defendant, Atlantic Coast Line Railroad Company, after the jury has found a verdict in favor of the defendant engineer, who was in charge of the engine and cars and who was the only person who could have stopped the engine and cars before the fatal accident?

"Question II: Was there any testimony on which the case could be properly submitted to the jury, except the testimony as to alleged admissions by the defendant engineer that he had seen plaintiff's intestate at a distance of fifty (50)

yards or at a greater distance from the place where plaintiff was lying in time to have stopped the engine to prevent the accident?

"Question III: Was plaintiff's intestate a trespasser?

"Question IV: Was the sole proximate cause of the death of plaintiff's intestate his own negligence or wilfulness in going on the tracks in a drunken condition?

"Question V: Was plaintiff's intestate guilty of contributory negligence that will bar recovery?

"Question VI: Was the verdict the result of passion and prejudice?"

Questions one and two as stated above involve the scintilla rule and accordingly, it will be necessary to review the evidence as construed under our rule most favorably to the plaintiff in order to decide the issues.

The death out of which the action arises occurred about 6:00 a. m. on Sunday, May 6, 1951, near the City of Charleston. At the time it was daylight and visibility was good. At the place of the death four railroad tracks run approximately north and south parallel to each other and parallel to King Street extension, one of the main streets leading southerly into Charleston. The said street is west of the railroad tracks and adjoining the street are, first, two tracks owned and used by the Southern Railway Company, and second, two additional tracks owned and used by the defendant company. The most easterly track of the defendant company is for north-bound trains, and the adjoining one is for south-bound trains. It is on this south-bound track that the death occurred. The terrain is level. There is evidence of three footpaths running parallel to the tracks, one to the west of all tracks and between the tracks and the street, one to the east of all tracks, and one in the middle between the tracks of the Southern and Atlantic Coast Line.

The area near and about the place of the death is a thickly populated one. A distinct footpath crosses all the tracks perpendicularly at a point just north of the place where the de-

ceased's body was found. It is known as the Silver Hill path. About 232 feet north of the Silver Hill path is another footpath crossing; and about 366 feet more northerly of the Silver Hill path is still another footpath known as the Ashepoo lane crossing. Witness Silas Welch also testified that "there are numerous little paths all along there, these little foot paths."

The defendant company's Diesel engine with three empty gondola cars attached was proceeding in a southerly direction towards Charleston along its south-bound track at a rate of speed estimated at from 12 to 15 miles per hour. The deceased, clad in trousers described variously as light, and tan, and brown, and khaki, and coat of gray, was lying motionless and drunk between the rails. There was considerable grass in between the tracks, described variously in height from 6 to 14 inches, and in color as green and brown.

The body was found south of the Silver Hill crossing at a point estimated by witnesses to be from the crossing anywhere from about 60 feet to about 125 feet. Before the tracks approach the Silver Hill crossing from the north there is a slight curve to the left. The engineer sat on the right side of the engine in the cab which was several feet back of the engine. It was contended that the curve and the engine prevented the defendant engineer from getting a full view of the track at this point, and apparently the jury adopted this view. But there is no question but that the switchman, P. M. Jenkins, who sat on the left, had full opportunity to fully observe, and no question but that the fireman, H. D. Todd, who was also sitting on the left and who testified that he could see around the switchman and was keeping a lookout ahead, had full opportunity to fully observe. Two other members of the train crew, C. B. Ford, a switchman, and M. C. Evans, the conductor, were on the train but were admittedly not keeping a lookout forward at the time.

The eye level of those riding in the cab of the engine was several feet above the level of the tracks such that both Jen-

kins and Todd could see, if keeping a lookout, there being admittedly no obstruction to their view and it being a clear morning. The engineer testified that as he approached the body he did not see it before he applied the brakes. He applied the brakes after Switchman Jenkins told him (the engineer) that he saw "something, or an object on the ground." Just prior to this the engineer stated that Jenkins told him something but he could not understand because he was sounding the whistle. Jenkins gave the same version of the occurrence and said that he first saw the body when he was about 50 feet from it. Both witnesses agree that Jenkins gave the first alarm which obviously was ineffective, and waited until the whistle stopped blowing to repeat and give an effective alarm. We think that Jenkins' failure to do something more effective earlier made a jury question as to his negligence or lack of negligence, and that whether or not he should have observed the body earlier was a jury question. Defendants assert that the grass was brown from escaping train steam, and blended with deceased's clothing, and made him difficult if not impossible to see until within 50 feet, but other witnesses stated that the grass was green, and we must here construe the evidence, under our rule, most favorably to the plaintiff. We might add, that from the excellent pictures in evidence, the grass surrounding the body and between and about the tracks appears not grossly different from other grass obviously without the range of escaping steam.

The train proceeded to travel the 50 feet after Jenkins admits he saw the body, plus the length of the train (estimated at 160 feet), plus about 30 or 40 feet, entirely past the body, before it stopped. And so after Jenkins says he first saw the body, the train, though going only 12 to 15 miles per hour, with three empty cars, traveled from 240 to 250 feet. A protrusion or underrigging about the center of the last car, struck the deceased on the head, killing him instantly. These facts support an inference that this was a poor stop and

that the train was not under proper control by reason of Jenkins' failure to act more effectively.

Plaintiff's witness Frank B. Wood, formerly with the Seaboard Air Line Railroad Company for 18 years, and more recently since 1938 with the Navy yard as yard conductor, testified that he was familiar with the capacity of engines such as involved here, to stop at certain speeds. He testified as follows:

"Q. Do you have an opinion, sir, if a Diesel engine, such as I showed you in plaintiff's exhibit No. 4, were driving on a level track, with three empty gondola cars, at twelve to fifteen miles an hour, how many feet would be required to bring it to a stop, on a service stop? A. I would judge, on a service stop, it would be something between, maybe, fifty and sixty feet, I would say, at twelve miles an hour; that's only three times as fast as a man walks.

"Q. Yes, sir. Now, what about on an emergency stop, how many feet would be required? A. An emergency stop should be some shorter than that. I wouldn't be able to estimate exactly the number of feet, but it would be some shorter than—much shorter than the—

"Q. Service— A. —service stop.

"Q. Well, now, if the train is independently controlled, that is, if the engine itself was broken and there was no air on the cars, how many feet would be required? A. I would say the braking power would be reduced there maybe one-third, according to the weight of the train.

"Q. Well, with three empty gondola cars, about how many feet would be required? A. That would be something like seven—about eighty feet."

The engineer testified that he "made a good stop." Defense witness Reed testified that it would require 175 feet to stop the train here involved under the circumstances. If the jury believed Wood's testimony (which is certainly not without logic as to the type of brakes which were on this train, or should have been on it) then at least one reasonable

inference to be drawn from the whole of the evidence was that the train was not under proper control as alleged in paragraph 12(d) and (k) of the complaint.

Having found adequate evidence to support one (or more) of the specifications of negligence, a jury question was involved such that it is unnecessary to consider questions one and two further; however, we conclude that there was also evidence to go to the jury on the question of whether the switchman (Jenkins) and the fireman (Todd) kept a proper lookout, notwithstanding their testimony that they did. We are impressed with the reasoning on this point of the trial judge in his order overruling a motion for judgment notwithstanding the verdict, and for a new trial, as follows:

"The cab of the Diesel locomotive is to the rear, the motor being forward of the cab. There was testimony that the view of the engineer to his left would be obstructed by the motor of the locomotive. The plaintiff offered testimony that there was a clear and unobstructed view for a distance of some nine hundred feet north of the point of the impact. There was no obstruction by reason of the motor to the view of the fireman and switchman to their left, and the engineer testified that he was relying on them for a lookout. Both the fireman and switchman agreed that there was no obstruction to their visibility from the Ashepoo Lane path to the point at which the deceased was killed, a distance of between, four hundred, fifty feet to five hundred feet.

"There was evidence that steam engines had been passing over the track bed, in the area in which plaintiff's intestate was struck, for some time, and that the grass between the rails had been scalded with hot water and burnt with hot coals to some extent. Photographs of the area were also in evidence which showed the extent to which grass was growing in the area in which plaintiff's intestate lay. While the defendant contended that the grass was brown and blended with the clothing and body of the deceased, there was evidence to the contrary that such grass as did exist was green.

The issue as to whether plaintiff's intestate was visible and could have and should have been seen was, in my opinion, clearly one for the jury to pass upon under the evidence.

"Under the testimony, viewed in the light most favorable to the plaintiff, as is proper in passing on the motions before me, the jury was warranted in finding that the deceased, who was clothed in light colored trousers, should have been observed by the fireman or switchman in a helpless condition at a point where the train could have been stopped in time to have avoided running over the deceased. The plaintiff offered testimony that the train could have been stopped within a distance of sixty feet, and the fireman on the locomotive agreed that the train could have been stopped within seventy-five feet on a service stop, and something less than that on an emergency stop. The jury was also warranted in finding that the switchman, who was on the left side of the engine, having been placed there by the conductor to maintain a lookout in company with the fireman, was negligent in not notifying the engineer of the danger in time for him to have stopped the train. The jury's verdict in favor of the engineer found support in his testimony that his view was obstructed by the motor of the locomotive and hence that he did not see the deceased in a helpless condition on the tracks."

Question four of appellant submits that the only reasonable inference to be drawn from the evidence is that the plaintiff's intestate's own negligence or wilfulness in going on the tracks in a drunken condition was the sole proximate cause of his death, and question five submits the same as to contributory negligence. Appellant cites the case of *Williamson v. Charleston & W. C. Railroad Company,* 222 S. C. 455, 73 S. E. (2d) 537, but we do not think the case controlling under the facts here.

This case was tried throughout on the theory of the doctrine of the last clear chance and the trial judge very properly and correctly charged the law relative thereto. That such doctrine applies in this State can no longer be ques-

tioned. See *Jones v. Atlanta-Charlotte Airline Railway Company*, 218 S. C. 537, 63 S. E. (2d) 476, 26 A. L. R. (2d) 297, and the cases therein cited.

In *Seay v. Southern Railway Company-Carolina Division*, 205 S. C. 162, 174, 31 S. E. (2d) 133, 138, this Court quoting with approval from 7 Enc. Law (2d), pp. 383-385, held as follows:

"* * * when the negligence of the person inflicting the injury is subsequent to and independent of the carelessness of the person injured, *and ordinary care on the part of the person inflicting the injury would have discovered the carelessness of the person injured in time to avoid its effect and prevent injuring him,* there is no contributory negligence, because the fault of the injured party becomes remote in the chain of causation. In such a case the want of ordinary care on the part of the injured person is held not a judicial çause (*i. e.,* a proximate cause) of his injury, but only a condition of its occurrence. * * * (Emphasis added by the Court.)"

Under the rule as stated it was for the jury to say: (1) When did Jenkins and Todd discover the deceased? And (2) should they have discovered him sooner? And (3) did they give adequate alarm? And (4) was the train under proper control? And lastly (based on such determinations), did the negligence of the plaintiff's intestate become remote in the chain of causation? Stated otherwise: Was negligence of the deceased the proximate cause of his death or only a condition of its occurrence? Obviously the jury decided all these issues adversely to the appellant.

Question three raises the issue: Was plaintiff's intestate a trespasser? It is well settled in this State that a license on footpaths about a railroad track does not lose his status as a licensee by virtue of sitting or lying prone upon said track adjacent to a path. As stated in *Jones v. Atlanta-Charlotte Airline Railroad Company, supra* [218 S. C. 537, 63 S. E. (2d) 479]:

" '* * * our Court, along with a majority of the Courts of other jurisdictions, has adopted what might be termed a liberal view, to the effect that a railroad does or may owe a duty to anticipate the presence of persons along or crossing its tracks at a well-defined pathway at a place in which it has acquiesced in a somewhat general use thereof (not amounting to a legally established public use), or where the circumstances have been such that the presence of persons on or along the tracks at that particular place may reasonably be expected.' "

In this case there is evidence of paths of long-established use running parallel to the north-bound and south-bound tracks of the defendant railroad company. There is evidence of a well-established path running perpendicular to the rails about 50 or 60 feet from the place where the body was found, it being known as the Silver Hill path or crossing. The evidence shows that the area is thickly populated and that much use is made of the railroad property for crossing over to King Street and return. In addition Witness Silas Welch testified as follows:

"A. There is a little garage in here (indicating), used-car garage or something. I remember that morning perpendicular to the body there was a little foot path. I don't see it here. Yes, sir, there is a little path here (indicating.)"

And also as follows:

"The path that I am talking about is not a court path like those other paths. It is a little footpath running across to this—".

And still further:

"There is no path what I see there like Cannady's Court, no, sir. Wasn't any path like that but there are numerous little paths all along there, these little footpaths."

Counsel for the defendants confronted the witness with a statement he had previously signed in which he stated that there were no paths, but the witness distinguished his previous statement from his testimony by

stating that in the written statement he referred only to paths apparently heavily used. This Court can only say that it became a jury issue. From a consideration of the whole of the testimony we cannot say as a matter of law that the plaintiff's intestate was trespassing but think that under the scintilla rule the inferences were questions of fact for the jury on this point.

Question number six raises the issue: Was the verdict the result of passion and prejudice? Under our cases the question of whether or not a verdict is excessive is addressed to the sound discretion of the trial judge, subject, of course, to the limitation that this Court will intervene in the case of an abuse of discretion. This Court is in agreement with the trial judge when he held in his order refusing to set aside or reduce the verdict, that "the fact that the jury exonerated the engineer was, in my opinion, a finding on the part of the jury in accord with the weight of the testimony." The fact that the jury exonerated the engineer, under all the facts in this case, does not indicate prejudice and it is obvious that the jury accepted the explanation which the defendants set forth to the effect that the vision of the engineer was obscured as a result of the curve. Nor is the amount of the verdict such as to require the intervention of this Court. The trial judge heard all the evidence and is in a better position than is this Court to rule upon this issue. The evidence shows that the widow is the only dependent of the deceased, that she is 44 years of age, that her husband was 49 years of age at the time of his death, and that at the time of his death he was a carpenter's helper earning $35.00 per week for regular time and an additional amount for overtime. From the whole of the testimony we conclude that this question must be decided adversely to the appellant.

The timely observations of Justice Stukes, speaking for the Court in the *Jones case, supra,* are equally applicable here, as follows:

"At first blush it may be startling that one may go upon a railroad track drunk or become so thereon and neverthe-

less be entitled to care from a train crew when his voluntary intoxication has incapacitated him to care for himself. But one insensible from voluntary drunkenness is after all not immediately substantially different from one unconscious because of innocent accident or illness. In both cases helpless human life is at stake. No doubt this consideration has moved this court and others to consistently hold that intoxication to the extent of helplessness interrupts the negligence of the victim so that subsequent negligence of a defendant brings into play the rule of last clear chance; or, in the thought and terminology of the *Seay case,* converts plaintiff's prior negligence into the remote, rather than the proximate, cause of the injury."

Let the judgment of the lower court be affirmed.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.