16906

VERA R. BROWDER, ADM'X., v. SOUTHERN RAILWAY CO.
(83 S. E. (2d) 455)

*Messrs. Moss & Moss,* of Orangeburg, and *Frank G. Tompkins, Jr.,* of Columbia, *for Appellant,*

*Messrs. Marshall B. Williams,* of Orangeburg, and *Hydrick & Hydrick,* of Orangeburg, *for Respondent,*

September 7, 1954.

OXNER, Justice.

This action was brought to recover damages for the alleged wrongful death of George H. Browder. The complaint is on the theory that while he was in a helpless condition on the track, a train of the Southern Railway Company, upon which E. B. LaTorre was the brakeman, negligently, willfully and wantonly ran over and killed him. The defendants denied all acts of negligence and further interposed a plea of contributory negligence, gross negligence and wantonness. Subsequent to the commencement of the action, the plaintiff took a voluntary nonsuit as to La Torre, and the action was continued against the Southern Railway alone.

The case was first tried before Judge Henderson who, at the close of plaintiff's testimony, granted a nonsuit. Later he concluded that he was in error and, on motion of the plaintiff, granted a new trial. On a second trial before Judge Johnson, the jury was unable to agree and a mistrial was ordered. The case came on for trial a third time before Judge Brailsford and resulted in a verdict for the plaintiff in the sum of $6,000.00. From the judgment entered thereon, the Railway Company has appealed.

The sole question presented is whether the Court erred in refusing the defendant's motion for a directed verdict made upon the grounds (1) that the plaintiff had failed to establish any actionable negligence on the part of the railroad company; (2) that plaintiff's intestate was guilty of gross contributory negligence and wantonness as a matter of law; (3) that plaintiff's intestate was a trespasser, to

whom the defendant owed no duty except not to willfully or wantonly injure him, and that there was no evidence of a breach of such duty; and (4) that any verdict for the plaintiff would have to be based on speculation, conjecture and surmise.

Browder, plaintiff's intestate, was 30 years of age, married and had four children. On Saturday night, September 2, 1950, he and two of his friends, whom he met at a filling station in the city of Orangeburg, decided to do some drinking. They walked to the home of a bootlegger where they bought a quart of liquor and then proceeded to a spur track of the Southern Railway Company. After walking along this track a short distance, they sat down at a point four or five hundred feet south of the gate through which the spur track enters the property of Kingan & Company. After drinking for awhile, Browder "passed out". The other two men finished the quart. About midnight they "rolled" Browder off the track and proceeded to their respective homes. Browder was never seen alive again. It is plaintiff's contention that he was run over and killed three or four hours later by a train of the Southern Railway engaged in switching operations over this spur track.

On Sunday night, September 3rd, an unsuccessful search was made for Browder in this area. About 7:30 or 8:00 o'clock the next morning he was discovered dead some three or four hundred feet from where his companions had rolled him off the track on Saturday night. His head and one arm, which had been severed from the body, were lying on the side of the track 68 feet south of the Kingan & Company gate. One of plaintiff's witnesses testified that they were "sealed to the track where the wheel went over him", and and that the imprint of the wheels could easily be discerned. The remaining portion of the body was found lying between the rails, with blood on the track, 43 feet farther south, or 111 feet from the Kingan & Company gate. There were multiple contusions and lacerations about the body. Another witness for plaintiff testified: "Look like from the

point that the head and arm was cut off from the rest of the body, the body on the inside of the track dragged back to where it was found." Between these points there were several blood spattered dollar bills and coins which were identified as the property of the deceased.

The spur track mentioned runs from the main line in an easterly direction for approximately 2,000 feet, then after a sharp turn, goes north across the premises of the Carolina Veneer Company and enters the property of Kingan & Company through a gate in a fence which separates the northern boundary of the lands of the Carolina Veneer Company from those of Kingan & Company.

The following description by the trial Judge of the section through which this spur track passes is abundantly sustained by the evidence: "The spur track on which the intestate met his death traverses a thickly populated, industrialized area, lying partly within and partly without the city of Orangeburg. The area is surrounded and intersected by streets, two of which abut on or cross the spur track. One well defined path crosses from east to west between the point where intestate was left by his companions and the point where his body was found. There was an abundance of testimony that the spur track itself had for many years been used by members of the public as a pathway."

About 3:20 A. M. on Sunday, September 3, 1950, or about three hours after Browder's companions had rolled him off the track and left him in a helpless condition from intoxication, an engine of the Southern Railway Company was backed slowly along the above spur track, pushing two loaded refrigerator cars which were to be spotted in the yard of Kingan & Company. The engineer, fireman and conductor rode in the cab of the engine while the flagman and brakeman, holding lanterns, stood on top of the lead car about the middle. The train stopped when the lead car reached a point about 20 feet from the Kingan & Company gate, which the flagman and brakeman unlocked. It was then

backed into the Kingan & Company yard and stopped with the front of the engine a short distance inside the gate. There were on the track in the yard two empty refrigerator cars, a tank car and a coal car which had to be moved in order to spot the two loaded refrigerator cars. For this purpose, the engine then pulled out of the yard with all six cars attached and proceeded along the spur track for a distance of 1,000 or 1,200 feet, where the two empty refrigerator cars were switched on the Lexington Lumber Company spur track, after which the coal car, tank car and two loaded refrigerator cars were again, with the flagman and brakeman on top of the lead car, pushed back along the Kingan & Company spur track and placed inside its yard. Having thus completed the necessary switching operations, the engine, with all members of the crew aboard, pulled out of the yard and stopped just beyond the Kingan & Company property in order for the flagman and brakeman to lock the gate, after which it proceeded on to the main line.

According to defendant's testimony, during the switching above mentioned, the train was not traveling over three or four miles an hour and made a loud "screaking" noise caused by the flanges of the wheels being pressed against the rails in going around the curve. The weather was clear. None of the crew saw anyone on or near the track. They did not learn of the death of deceased until after he was discovered Monday morning. They said there was a floodlight on the gate of Kingan & Company, but it would have been of no value in seeing an individual lying on the track because it would make him appear "more or less like a shadow on the ground." The front of the engine was equipped with the standard headlight but the crew stated that in going forward no one lying on the track could have been seen because the grass thereon was about knee high. This testimony as to the grass was sharply contradicted by that of several of plaintiff's witnesses who said that it was not high enough to furnish any obstruction to the view. Turning now to the visibility in backing, there was a light on the tender

of the engine but it provided no illumination because it was lower than the refrigerator cars. The lanterns held by the flagman and brakeman as they stood on top of the lead car about the middle were wholly insufficient to enable them to see anyone lying on the track. Defendant's testimony was to the effect that these two members of the crew could not have ridden on the side of the box car because of the danger of being brushed by protruding limbs and other objects. The flagman testified as follows:

"Q. If there had been an object along this track as you went in, could you have seen it? A. If it was down as high as a foot from the ground, no.

"Q. If it was as high as a man standing, could you have seen it? A. Yes.

"Q. How? A. By the light of the moon.

"Q. In other words, you and Mr. LaTorre as you backed down the track had to depend on the light of the moon to see anything on this track? A. Yes, sir."

We shall first consider the status occupied by the deceased when on the spur track. Appellant contends that he was a trespasser for whom no lookout was required. Respondent contends, and the Court below held, that the evidence reasonably warrants an inference that he was a licensee, but that even if he were a trespasser, there was evidence of gross negligence and wantonness in failing to discover him on the track in time to avoid injuring him which would require submission of the case to the jury under the general rule "that the railroad company owes to a trespasser on its track the duty of so operating its trains as not to injure him wantonly or by such gross negligence as indicates a reckless disregard of human life." *Woodward v. Southern Railway,* 90 S. C. 262, 73 S. E. 79, 80. Also see *Wilson v. Southern Railway Co.,* 93 S. C. 17, 75 S. E. 1014; *Tyler v. Atlantic Coast Line Railway Co.,* 104 S. C. 107, 88 S. E. 541. Judge Henderson reached the same conclusion in his order setting aside the order of nonsuit granted on the first trial.

It was held in *Hayes v. Atlantic Coast Line Railway Co.*, 196 S. C. 386, 13 S. E. (2d) 921, 923, that a "railroad does or may owe a duty to anticipate the presence of persons along or crossing its tracts at a well-defined pathway at a place in which it has acquiesced in a somewhat general use thereof (not amounting to a legally established public use), or where the circumstances have been such that the presence of persons on or along the tracks at that particular place may reasonably be expected." The foregoing has been quoted with approval and applied in several subsequent decisions. *Nettles v. Southern Railway Co.*, 211 S. C. 187, 44 S. E. (2d) 321; *Jones v. Atlanta-Charlotte Air Line Railway Co.*, 218 S. C. 537, 63 S. E. (2d) 476, 26 A. L. R. (2d) 297; *Miller v. Atlantic Coast Line Railway Co.*, S. C., 81 S. E. (2d) 335.

The overwhelming weight of the evidence is to the effect that along this spur track up to a point approximately 270 feet south of the Kingan gate, there had been such use of the railroad bed by the general public, known to and acquiesced in by the railroad company, as to require those in charge of the trains to keep a reasonable lookout and to exercise due care to prevent injury to persons using the track. But it is strenuously argued that there is no evidence showing such use within 270 feet of Kingan gate and that anyone using this portion of the track was a trespasser. As previously stated, the deceased was found in this area. His body was 111 feet, and his head and arm 68 feet, south of the Kingan gate. While the evidence of a public use of the track in this area is not as strong as that farther south, we think the testimony of several witnesses tended to show such general usage practically up to the Kingan gate as to warrant an inference that deceased was a licensee. The trial Judge stated in his order refusing a directed verdict *non obstante veredicto* that there was some evidence tending "to show a somewhat general use of the track as a pathway as far north as the corner of the building opposite which the intestate's body was found."

If, from the sharply conflicting evidence, the jury concluded that respondent's intestate was a licensee, a duty was imposed upon the railroad company to keep a reasonable lookout for him and others who might be on or along this spur track. Is there any evidence showing a breach of such duty? We think in backing the train there was evidence not only of lack of due care but of recklessness. The train was backed twice along this spur track with only the flagman and brakeman keeping a lookout. The lanterns which they held as they stood on top of the lead car provided little or no illumination of the track. Obviously they were not in a position to keep a proper lookout during the backward movements of the train. In *Carter v. Seaboard Air Line Railway Co.,* 114 S. C. 517, 104 S. E. 186, 188, the Court said:

"* * * if a railroad train shall be operated backward along its track on a dark night, and at a place accustomed to be used by the people for a walkway, with the knowledge of the operators, then the operators must use due care to prevent injuries to the people."

There is also evidence reasonably warranting an inference that during the forward movements of this train, either the engineer or fireman should in the exercise of ordinary care have seen a person helpless on the track. It was traveling only three or four miles an hour and, in fact, stopped twice just outside of the Kingan gate, within 50 feet of where the head and arm were found and within less than 100 feet of where the body was lying between the tracks. As previously stated, the deceased was never seen by the crew either before or after he was killed. It is true they testified that on account of the height of the grass it was impossible to observe one lying on the track, but the conflicting evidence in this respect made an issue for the jury as to whether the grass was of sufficient height to constitute an obstruction to the view.

Was the deceased guilty of contributory negligence or gross negligence as a matter of law? The allegations of the answer in support of this defense are:

"* * * On the night stated in the complaint, plaintiff's intestate, H. H. Hooker and L. O. Jeffers proceeded to a point about fifty feet north of a curve in the railroad track mentioned and referred to in the complaint, carrying with them a bottle of whiskey, where high grass and weeds were growing and trash and debris were scattered upon and near the said track, a place of obvious and known danger, where the three stopped for the purpose of drinking the said whiskey and drank so much thereof that plaintiff's intestate became helplessly intoxicated upon the said track, and in so doing plaintiff's intestate surrendered himself to the care and custody of his said companions, who thereafter left plaintiff's intestate in his known helpless condition upon or dangerously near the rails of the said track, all of whom, together with plaintiff's intestate, knew that trains shifted over the said track at irregular intervals."

Under the doctrine of last clear chance, which prevails in this State, even though the deceased negligently exposed himself to a risk of danger while intoxicated or became intoxicated after a negligent exposure to danger, if he was on the track in a helpless condition and those in charge of the train discovered, or in the exercise of ordinary care should have discovered, him in such perilous situation in time to avoid injuring him by the exercise of ordinary care, the railroad company would be liable. *Jones v. Atlanta-Charlotte Air Line Railway Co., supra,* 218 S. C. 537, 63 S. E. (2d) 476, 26 A. L. R. (2d) 297, and *Miller v. Atlantic Coast Line Railway Co., supra,* S. C., 81 S. E. (2d) 335, and cases therein cited. The subject is annotated at length in 26 A. L. R. (2d), beginning on page 308. It is clear under these authorities that the question of contributory negligence or gross negligence was one for the jury.

Finally, it is contended that the verdict is founded upon "speculation, conjecture and surmise". It is argued that the respondent himself is uncertain whether his intestate was killed while the train was backing or going forward. It is true that the respondent has not been

able to definitely establish whether Browder was killed during the forward or backward movements of the train. However, the allegations of the complaint are broad enough to cover both, and we do not think any uncertainty in this respect required the direction of a verdict in favor of appellant because, as heretofore pointed out, there was evidence of negligence during both the forward and backward movements of the train.

In further support of the claim that the verdict is founded upon speculation, this question is asked in appellant's brief: "Was Browder alive when he was run over by the train or was he planted on the track?" Aside from the fact that we cannot presume a felonious and intentional killing, there is no medical or other testimony reasonably supporting such theory. On the contrary, the physical evidence strongly indicates that the deceased was run over and killed by the train. It must be kept in mind that the fact that an injury may have been caused in one of two or more ways does not preclude recovery, if the facts and circumstance in evidence warrant a reasonable inference that it was caused in any way alleged in the complaint for which the defendant would be liable. *Steele v. Atlantic Coast Line R. Co.,* 103 S. C. 102, 87 S. E. 639; *Barnwell v. Elliott,* 225 S. C. 62, 80 S. E. (2d) 748.

A similar contention was made and overruled in *McMillan v. Southern Railway,* 196 S. C. 373, 13 S. E. (2d) 915, where the circumstances were not as strong as those presented in the instant case.

Affirmed.

STUKES and TAYLOR, JJ., and J. FRANK EATMON, Acting Associate Justice, concur.

LEGGE, J., disqualified.