17185

WILLIE YOUNG, Administratrix of the Estate of Bennie Young, Deceased, Plaintiff-Respondent, v. CHARLESTON & WESTERN CAROLINA RAILWAY COMPANY, Defendant-Appellant .

(93 S. E. (2d) 866)

*Messrs. Ralph T. Wilson,* of Laurens, and *A. C. Todd,* of Greenwood, *for Appellant,*

*W. Hummel Harley, Esq.,* of Laurens, *for Respondent.*

July 12, 1956.

TAYLOR, Justice.

This appeal arises out of an action brought in the Court of Common Pleas for Laurens County by Respondent for the wrongful death of one Bennie Young.

The specifications of negligence set forth in the complaint are as follows:

"8. That the aforesaid wrongful death of plaintiff's intestate and the resultant damages, were directly and proximately caused by the following acts of negligence, carelessness, recklessness, willfullness and wantonness of the defendant, to wit:

"(a) In failing to equip the freight car leading the train in this instance with proper head light, as required by the statutes of this State.

"(b) In failing to equip said freight car with whistle or bell so that the signals required by the statutes of the State could be given.

"(c) In failing and neglecting to give the signals required by the statutes of the State should be given at public crossings and traveled ways.

"(d) In failing and neglecting to have a flagman upon said freight car to warn the public and particularly the plaintiff's intestate, of the approach of said train.

"(e) In failing and neglecting to have any communication system from any watchman or flagman who may have

been about said freight car and the crew in control of said locomotive to warn them of any dangers or of any helpless persons on the track.

"(f) In failing and neglecting to give the statutory signals or any warnings whatever of the approach of said train by way of a head light, ringing of a bell, blowing of a whistle or otherwise.

"(g) In failing to keep a proper or any kind of lookout for persons helpless upon said track.

"(h) In failing to provide reasonable, capable and competent agents, servants and employees to operate said train at the time and place.

"(i) In failing to stop said train upon striking plaintiff's intestate thereby aggravating the wounds inflicted about his body.

"(j) In failing to have on said freight car any equipment that would aid or assist a watchman or flagman in detecting plaintiff's intestate upon the track in time to stop said train before injuring him."

Appellant set up by way of answer a general denial and contributory negligence, willfullness, wantonness, and recklessness.

The cause was tried before the Honorable Steve C. Griffith and a jury at the May, 1954, Term of Court and resulted in a verdict for Respondent in the sum of $750.00 actual damages.

Appellant made timely motions for a nonsuit, directed verdict, and judgment *non obstante veredicto,* all of which were overruled; and this appeal presents the questions of whether or not the Court erred, first, in overruling the aforesaid motions, and, second, whether or not it was error to charge the principles applicable to the last clear chance rule.

In the early hours of the morning of June 6, 1953, Appellant's train of thirteen cars and cab was being backed upgrade and around a curve at the rate of ten to twelve miles

per hour in the switching yards at Laurens, South Carolina. The conductor and flagman were riding the rear of the cab when they observed a dark object, across the East rail, which they did not recognize at first as human; but the conductor applied the emergency brakes immediately. The train came to a stop after the cab and four and one-half cars had passed over the legs of Respondent's intestate. The bell was ringing on the engine and the air whistle, which was operated by the conductor at the rear of the train was being sounded for a crossing immediately adjacent to where the deceased was lying. Both the flagman and conductor had electric lanterns, a burning fusee had been placed at the end of the cab by the flagman, and the tail lights on the cab were burning. The deceased was conscious after the crew reached him; and when asked what happened, replied: "Well, I don't know, sir. I had a spell, went to sleep or something, I guess * * * I don't know what happened. * * * We just left town. Harris left me at the end of the trestle and said he was going to a cousin's house. I don't know why I'm here." Respondent's intestate was admitted to the hospital emergency room at 2:45 A. M. and died at 6:30 A. M. of the same day, June 6, 1953.

The conductor, who operated the air whistle from the rear of the cab, was also in position to apply the emergency brakes and testified that he did so as soon as he became aware that there was an object across the tracks. The application of the brakes by the conductor from his position on the rear of the caboose was just as effective as though they had been applied by the engineer from the cab of the engine, and there was no act necessary on the part of the engineer to bring the train to a stop. The stop was described as a "normal stop" and a "good stop."

Johnny Harris, the person referred to in the statement of deceased prior to his death, testified that he and the deceased drank approximately two quarts of whiskey that night and were on their way to the home of his sister-in-law to obtain more. The sister-in-law lived adjacent to the railroad right

of way, and he had left deceased only a few minutes before and was in the house at the time of the occurrence.

The switching yard is located in a thickly populated area, and there is evidence to the effect that there are well-worn paths in the immediate vicinity both parallel to and across the tracks which are used by the public generally from which the jury could have concluded that such use was known to and acquiesced in by the railroad company.

The flagman and conductor who were riding the rear of the caboose testified that they were keeping a proper look-out at all times but the night was dark; that when they were close enough to recognize the object upon the rail as human, the train could not be stopped in time. The flagman stated that they were "almost upon it," and the conductor esti-mated the distance from where the deceased lay to the end of the cab as being 240 feet and the distance from the cab when he first saw the object as being 90 feet; therefore, ac-cording to this testimony, the train, which was going ten to twelve miles per hour, upgrade and around a curve, con-tinued approximately 330 feet after the emergency brakes were applied before coming to a stop.

"* * * if a railroad train shall be operated backwards along its track on a dark night, and at a place accustomed to be used by the people for a walkway, with the knowledge of the operators, then the operators must use due care to pre-vent injuries to the people." *Carter v. Seaboard Air Line Railway Co.*, 114 S. C. 517, 104 S. E. 186, 188; *Browder v. Southern Railway Co.*, 226 S. C. 26, 83 S. E. (2d) 455.

Appellant contends that there was no evidence of lack of due care on its part: The tail lights on the cab, the fusee, and the two lanterns were all burning; the point where deceased was lying was on a curve, and it would have made no dif-ference had the engine with its headlight been in the front of the train, rather than backing, as the light would have shown straight ahead; however, the conductor did admit upon cross-examination that such light would have furnished

illumination straight ahead for 800-1,000 feet and was not sure as to what effect it would have had on the position where deceased was lying as there was a slight curve in the tracks.

Respondent's position throughout was that the ringing of the bell on the engine, fourteen cars and cab away, was of little or no warning to the public at large of a backing train and that while the tail lights, lanterns and fusee on the back of the train might have been sufficient warning to persons who had control of their faculties and were aware of their surroundings, it was of no value whatever to one who was lying helpless upon the tracks; and these lights did not provide sufficient illumination for the train crew to observe far enough ahead of the advancing cab to stop the train in sufficient time to prevent running over Respondent's intestate who was helpless upon the tracks.

According to the testimony of the conductor and flagman, they were keeping such lookout as was possible and such was a proper lookout, but their testimony also reveals that with the lights used, they were unable to distinguish the object upon the track until they were almost upon it; that although the train was traveling from ten to twelve miles per hour around a curve and on an upgrade, it was not stopped until it had traveled approximately 330 feet; and that the train could not have been stopped in a shorter distance. It, therefore, became a question for the jury as to whether or not the lights used were adequate and by their use Appellant had exercised or failed to exercise ordinary or due care under the circumstances.

There being sufficient evidence regarding one of the specifications of negligence as to require consideration by the jury, the motions for nonsuit, directed verdict, and judgment *non obstante veredicto* were properly overruled. *Miller v. Atlantic Coast Line R. Co.*, 225 S. C. 217, 81 S. E. (2d) 335.

The next question must also be resolved against Appellant's contention as 'Under the doctrine of last clear chance, which prevails in this State, even though the deceased negligently exposed himself to a risk of danger while intoxicated or became intoxicated after a negligent exposure to danger, if he was on the track in a helpless condition and those in charge of the train discovered, or in the exercise of ordinary care should have discovered, him in such perilous situation in time to avoid injuring him by the exercise of ordinary care, the railroad company would be liable. *Jones v. Atlantic-Charlotte Air Line Railway Co., supra,* 218 S. C. 537, 63 S. E. (2d) 476, 26 A. L. R. (2d) 297, and *Miller v. Atlantic Coast Line Railway Co., supra* * * *" Annotations, 26 A. L. R. (2d), beginning on page 308; *Browder v. Southern Railway Co., supra.*

For the foregoing reasons, we are of the opinion that all exceptions should be dismissed, and it is so ordered.

Affirmed.

STUKES, C. J., and Moss, J., concur.

OXNER and LEGGE, JJ., dissent.

STUKES, Chief Justice (concurring).

Upon application of the rule that the evidence must be considered in the light most favorable to respondent, I concur in the opinion of Mr. Justice Taylor.

Appellant's contention that it was error to charge the principle of last clear chance is not available on appeal for the reason that it was not timely objected to in the trial court. Sec. 10-1210, 1955 Cumulative Supplement to the Code of 1952, and cases cited in the footnotes thereto.

Reverting to the evidence, the testimony of the conductor, whom plaintiff called as a witness, should be pursued further than it is quoted in the opinion of Mr. Justice Legge.

The conductor said that he first saw the object on the track, which turned out to be the decedent, when only two car lengths away, when he applied the brakes and he did not

recognize it as the body of a man until later; he applied the brakes for his own protection. Quoting from his testimony, repeating some which is also quoted by Mr. Justice Legge, in order to show the connection:

"Q. * * * If you had a headlight back there, could you see any farther with it than you do with these electric lanterns? A. I could have seen further, but I don't know whether I could have seen further in the direction of the individual lying on the track.

"Q. You could have seen further than with an electric lantern? That makes sense, doesn't it, Mr. Tedards? A. Yes."

There was other evidence which, I think, tended to establish negligence with respect to the lack of adequate illumination of the track behind the backing train. "That proof of a plaintiff's cause of action (where a nonsuit is not granted) can be supplied by a defendant, and conversely, proof of a defendant's defense can be supplied by a plaintiff, is a postulate which cannot be denied." *Greenville County v. Stover,* 198 S. C. 240, 17 S. E. (2d) 535, 537. Incidentally, while ordinarily a party may not impeach the credibility of, or contradict, his witness, he may prove his case by other evidence although it is in direct conflict with the testimony of a former witness called by him. See the cases collected in 19 S. C. Dig. 408, Witnesses, 400.

The flagman, who was a witness for defendant and who was standing on the rear end of the backing train, with an electric lantern in his hand, testified in part as follows:

"Just directly as we crossed Hance Street we noticed an object on the track. We couldn't tell what it was right then at the moment we saw it. Conductor Tedards immediately applied the brakes and just as we almost directly got on top of the object we could tell it was a man. * * *

"Conductor Tedards immediately put the brakes in emergency position because he didn't know whether it was a cross-tie, or log, or what it was laying on the track that

might derail the train. We was almost upon it before we knowed it was a man and the brakes were already on at the time."

From the foregoing, I think it reasonably inferable that defendant was negligent in backing its train without light sufficient for the members of the crew who were maintaining a lookout to determine that an object on the track was the body of a man until the train was upon it.

In evidence as the defendant's exhibit is blue print of a map of the railroad tracks and surroundings, which was made by its engineering department. The conductor testified, quoting from his testimony, "Shortly after crossing Hance Street I saw an object lying directly across the rails." The map shows that the curve in the track from the end of a trestle, before Hance Street was reached, to the location of decedent on the track, is a curve of between five and six degrees, which may fairly be said is not a sharp curve, and the map shows no obstruction to the view after the trestle was crossed. From the map it appears that the distance between the end of the trestle and Hance Street is about one hundred and forty feet; and from Hance Street to the end of the curve, approximately where decedent lay, is about two hundred and ten feet. (These distances were testified to as aggregating 344 feet.) Thus there was a distance of about three hundred and fifty feet of unobstructed vision, with little or no interference because of the curve, from the end of the trestle to decedent. It is reasonably inferable that the lookout would have seen decedent if the track had been lighted ahead of the moving train and that due care required such, with ample distance in which to stop the slowly moving train and avoid taking the life of decedent. The testimony is that the train was actually stopped within that distance.

There was no objection on the part of the defendant to the following instructions to the jury:

"I charge you that independent of any statute—and so far as has been called to my attention no statute of this State

applies to this case, but is based upon what we call the common law—independent of any statute the law requires the railroad company to use due care, or ordinary care, for the safety of persons who may lawfully be or enter upon its tracks, under what we call the common law and which you gentlemen call common sense. The railroad company is required, acting through its agents and servants in charge of its trains, to operate them in a reasonable and prudent manner, to keep a reasonable lookout for persons who may be lawfully upon or about to enter upon a railroad track, and to equip that train with such devices as ordinary prudence and care would dictate should be used so as to keep a reasonable lookout, and generally to do what a person of ordinary reason and prudence would do in the same circumstances, and the failure so to do would be negligence."

I conceive it to be the common law duty of a railroad company to have at the forward end of a train, which is moving at night, a light sufficient to illumine the track for a reasonable distance ahead, certainly where the movement is through a thickly populated town and over numerous street crossings, as here. The hand lanterns of the crewmen were as ineffective in result in this instance as if there had been no lights, and surely all would concede that no lights would be negligence. Here we have the equivalent. I think the jury were fully warranted, under the testimony of the train crew, to find that the company failed in its duty. I am impelled to this conclusion by the authority of *Carter v. Seaboard Airline Ry. Co.,* 114 S. C. 517, 104 S. E. 186.

There are many similarities between the facts of the *Carter case* and of this. A large verdict for actual and punitive damages was affirmed in that case for the death of one who was struck by a backing train in the suburbs of the city of Charleston. It was said in the opinion that the theory of the plaintiff was that decedent was walking upon or near the railroad track, while the theory of the defendant was that he was, quoting, "lying in a fit on the track;" and the train was backing, quoting, "with the caboose at the tail end and

no headlight upon it." It was further said in the course of the opinion that, independent of statute, quoting, "if a railroad train shall be operated backward along its track on a dark night, and at a place accustomed to be used by the people for a walkway, with the knowledge of the operators, then the operators must use due care to prevent injuries to the people." Toward the end of the opinion it was repeated that the train was moving backward at night, without headlight, ten or fifteen miles an hour along or close by certain named streets.

Likewise there is little difference between the case at bar and *Browder v. Southern Ry. Co.,* 226 S. C. 26, 83 S. E. (2d) 455. There two crewmen of the backing train stood with lanterns atop the lead car and saw nothing of the man upon the track. Here the crewmen with lanterns at the end of the lead car saw nothing until within two car lengths and were able to recognize the object to be a man only when upon him. In both cases the lanterns were insufficient to illumine the track ahead of the backing trains. The *Carter case* was cited with approval and relied upon to sustain the verdict in the *Browder case.*

Legge, Justice (dissenting).

Being convinced that the record in this case discloses a total failure of proof of negligence on the part of the defendant, I must respectfully dissent.

The only witness offered by the plaintiff in her attempt to prove negligence was the conductor. He testified that he was standing on the rear end of the caboose, with his lighted electric lantern in one hand and his other hand on the airbrake valve, as the train, consisting of thirteen cars and the caboose, was backing around a curve at about 10 miles an hour; that he and the flagman were observing the track ahead of them and he was blowing the air whistle, and that the bell on the locomotive was ringing; that instantly upon perceiving an object on the rail he applied the brakes in emergency; and that the train was brought to a stop as quickly

as possible. This testimony was without contradiction and was corroborated by the flagman, a witness for the defendant, who was standing with the conductor on the end of the caboose, also holding a lighted electric lantern; and, with respect to the blowing of the whistle, the ringing of the bell, the application of the brakes and the stopping of the train as quickly as it could be stopped in emergency, it was further corroborated by the engineer and the fireman, who were in the cab of the engine at the other end of the train.

I cannot find in the record any evidence warranting inference that the train could have been stopped more quickly. *Miller v. Atlantic Coast Line R. Co.,* 225 S. C. 217, 81 S. E. (2d) 335, is inapplicable here, because in that case there was expert testimony to that effect.

Nor can I perceive any substance in the suggestion that the testimony here warrants the inference that the railroad company was negligent in not having a headlight on the caboose. The only allegations of negligence in this respect are those of paragraph 8(a) and (j) of the complaint, of which (a) charges that the rear car was not equipped "with proper headlight, as required by the statutes of this State", and (j), that there was not "on said freight car any equipment that would aid or assist a watchman or flagman in detecting plaintiff's intestate upon the track in time to stop said train before injuring him". No statute or regulation has been called to our attention, nor do we know of any, that requires a headlight on the rear of a backing train. But construing the allegations above quoted as charging negligence at common law in not having sufficient lights on the rear of the backing train, I can find no evidence in the record that the two electric lanterns were not being properly used at the time of the accident, or that they did not adequately illuminate the track. That the jury had the right to reject the estimony of the conductor and the flagman on that issue is beside the point; its verdict required a finding of negligence, and cannot be justified in the absence of evidence of negligence.

Nor is there any evidence from which it may reasonably be inferred that if there had been a headlight on the rear of the caboose plaintiff's intestate could have been seen at any greater distance. The leading opinion correctly states that "it would have made no difference had the engine with its headlight been in the front of the train, rather than backing, as the light would have shone straight ahead". But it seems to me that there is no justification, under the evidence, for the conclusion that a finding of negligence was warranted because the conductor "was not sure as to what effect it (a headlight) would have had on the position where deceased was lying." The full text of the record of the conductor's testimony in that regard was as follows:

"Q. How far can you see with a headlight? A. In perfect weather conditions at least 800 or 1,000 feet, at least.

Q. The weather on this night was clear, was it not? A. Yes, sir.

\* \* \*

Q. Mr. Tedards, if you had a light on the back of that caboose—I don't mean a lantern, I mean a light—if it had been equipped with a light, you'd have seen this man in time to stop and avoid running over him, wouldn't you? A. I don't know that I would have.

Q. How far is 800 feet in car lengths? A. Twenty cars, I guess.

Q. Twenty cars? A. 18 to 20.

Q. So every night now, six nights a week, knowing you were going through this same procedure, no one on the railroad took the concern of equipping that caboose with a proper light to see? A. No, sir, a light wouldn't have shined on this object until across Hance Street. I saw the object around the same time. It's a curve and a light wouldn't have shined around a curve.

Q. A light would have made it a lot clearer? A. I don't know whether it would on the spot of the accident.

\* \* \*

Q. So then by reasonable deduction, Mr. Tedards, if you had a normal headlight on the back of that train—you say you can see how far, eight hundred or a thousand feet? A In a line of sight, yes, sir.

Q. You wouldn't have run over the man if you had had one you could see at all with, would you? A. I can't say that is a true statement.

Q. What is a true statement? If you had had a headlight back there, could you see any farther with it than you do with these electric lanterns? A. I could have seen further, but I don't know whether I could have seen further in the direction of the individual lying on the track."

The factual situation here, with respect to lights, distinguishes this case from *Carter v. Seaboard Air Line R. Co.,* 114 S. C. 517, 104 S. E. 186 (where, so far as the report shows, there were no lights at all), and from *Browder v. Southern R. Co.,* 226 S. C. 26, 83 S. E. (2d) 455 (where the only lights on the lead car of the backing train were lanterns held by employees on top of the car, giving little or no illumination to the track).

The judgment should be reversed and the cause remanded for entry of judgment in favor of appellant.

OXNER, J., concurs.