16688

WILLIAMSON v. CHARLESTON & W. C. R. CO.
(73 S. C. (2d) 536)

*Messrs. Henderson, Salley & Cushman,* of Aiken, and
*McKay & McKay,* of Columbia, *for Defendant-Appellant,*

456

*Messrs. Williams & Busbee,* of Aiken, *for Respondent,*

*Messrs. Henderson, Salley & Cushman,* of Aiken, and *McKay & McKay,* of Columbia, *for Defendant-Appellant, in reply,*

December 5, 1952.

OXNER, Justice.

This is an action under Lord Campbell's Act, Sections 411 and 412 of the Code of 1942, to recover damages for the

alleged wrongful death of Herbert Hickson who was struck and instantly killed about 4:00 A.M. on Saturday morning, November 1, 1947, by a freight train of the Atlantic Coast Line Railroad, which was being operated upon the tracks of the Charleston & Western Carolina Railway Company, at a point about a half mile north of Bush's Station in Aiken County. The trial resulted in a verdict for the plaintiff in the sum of $3,625.00 actual damages. The only question which we find it necessary to determine is whether the Court erred in failing to grant defendant's motion for a nonsuit at the close of the plaintiff's testimony and later a motion for a directed verdict at the close of all the testimony, upon the ground that the plaintiff had failed to establish any actionable negligence on the part of the Railroad Company.

Plaintiff offered testimony to the following effect: The deceased, a Negro laborer about 36 years of age, together with his wife and children, lived in a house located near the railroad. On several occasions, about a year apart, he had suffered an attack of "indigestion" causing him in each instance to immediately collapse and remain unconscious for a period of about an hour. On Friday night, October 31, 1947, he and his wife went to the home of another Negro, about four miles away, where they, along with fifteen or twenty others, attended a supper. There was no drinking. About 11 or 12 o'clock that night, the deceased, after stating that he had to go to Ellenton early the next morning to attend to some business, left with his wife and returned home. Shortly thereafter he complained of feeling badly. His wife went to bed and left him sitting in a chair. She never saw him alive again. Several hours later he was killed by a freight train at a point about a half mile from his house. He was found lying about 10 feet from the railroad track with his trousers unbuttoned and down near his knees.

The train which killed the deceased consisted of a diesel engine and twenty-five cars. The accident occurred in a rural area about 30 yards from a neighborhood crossing. Here the track is straight for quite a long distance. The

train was proceeding upgrade, although the degree of inclination is not shown. The hamlet known as Bush's Station was described in the plaintiff's testimony as follows:

".Q Bush Station, do people live around there, is there a sawmill there, good many Colored people live around there? A. Yes, sir.

"Q. Any White people live there? A. Yes, sir, one family."

Plaintiff offered further testimony to the effect that there had been such use of the railroad bed by the general public, known to and acquiesced in by the railroad company, as to reasonably warrant an inference that the deceased was a licensee so as to impose upon the railroad company the duty to use ordinary care to prevent injury to him.

The only acts of negligence alleged in the complaint are that the agents and servants of the defendant were operating the train at a high and reckless rate of speed and failed to keep a proper lookout. It is asserted that the plaintiff's intestate was upon the roadbed in .a helpless condition and those in charge of the train "failed to keep a reasonable lookout upon the occasion in question, which would have enabled them to discover plaintiff's intestate, sitting or lying helplessly upon the railroad track, and have enabled them to stop said locomotive and railroad train before running into and killing plaintiff's intestate." There was no testimony whatsoever offered by the plaintiff tending to sustain either act of negligence alleged in the complaint. However, since the trial Judge refused defendant's motion for a nonsuit, we must look to all the testimony to determine whether or not there is any proof of actionable negligence. We, therefore, now turn to the testimony offered by the defendant.

The engine was equipped with two lights, one a straight headlight focused down the track to enable the engineer and fireman to see ahead, and the other a "Mars" light which "works from one side of the right of way to the

other", designed to attract the attention of anyone on or approaching the railroad. The evidence shows that this is standard equipment for a diesel engine.

The engineer testified that as he was traveling about 45 miles an hour, the regulation speed in this area, with the bell ringing, he observed a person between 150 and 175 yards ahead in a "stooped" or "crouched" position over the right hand rail; that he immediately put his brakes in emergency and blew the horn or whistle, but the deceased never moved or otherwise indicated that he was aware of the approaching train; that he was unable to stop until after the accident; that it is impossible to see a person sitting on the track in the position the deceased was until within 150 or 175 yards of such person; that a train traveling at the rate of 45 miles an hour cannot be stopped within this distance, and that to do so would necessitate running the train at a speed not exceeding 20 or 25 miles an hour. He stated positively that the presence of the deceased on the track could not have been discovered earlier and that everything possible was done to avoid striking him.

The fireman, who saw the deceased at about the same instant as the engineer, corroborated the testimony of the latter. The only other member of the train crew on the engine was the brakeman, who was on the left side just back of the fireman, looking toward the rear of the train for hot boxes, brake riggings, etc. He testified that he noticed the application of the emergency brakes. He said that upon hearing a "lick out there in front", he looked out and got a glimpse of something but did not know what it was. He further testified:

"Q. About how long would you say it was from the time you heard the brakes until the time you saw the man? A. I reckon about three or four seconds.

"Q. When you saw him you were how far from him? A. I reckon about 20 feet from him."

We find nothing in defendant's testimony tending to show negligence either in failing to keep a proper lookout or in operating the train at an excessive rate of speed, which are the only two acts of negligence alleged in the complaint. The only reasonable inference to be drawn from the testimony is that the presence of the deceased on the track was discovered at the earliest opportunity, after which the engineer did all that could be done to avoid injuring him. There is no allegation in the complaint that the headlight was insufficient. It was of a modern, standard type. There is no claim that the brakes were defective. The train was not operated in excess of the maximum speed specified by the railroad company or in excess of the usual rate of speed maintained in this area. It cannot be said that a speed of 45 miles an hour at the place in question constitutes negligence. There is no proof of any circumstances or conditions demanding a lower rate of speed. Of course, where the facts concerning the speed of the train and the surrounding circumstances are such that there may be a fair and reasonable difference of opinion as to whether it is excessive, the question of negligence is for the jury. We have so held in numerous cases, but in all of them there was proof of circumstances demanding a speed less than that at which the train was being operated. In some of these decisions there was evidence of the violation of a speed statute or ordinance. Several involved the running of a train either with no headlight or inadequate headlights. In others the train was being operated in a thickly populated area or under other circumstances requiring unusual caution. None of these circumstances or conditions were present in the instant case.

Our attention is called to certain testimony by the engineer which it is claimed warrants the inference that it took the train fifty minutes to travel from the town of Robbins to the place of the accident, a distance of 10 miles. From this it is argued that either the train was being operated at the time of the accident at a speed considerably less than 45

miles an hour or the speed was suddenly increased as the train approached the locus. But the engineer did not undertake to fix definitely the time when the train left Robbins. In fact, he said: "I don't recall exactly the time." The conclusion sought to be drawn from this testimony is purely speculative.

The testimony shows that the deceased could not have been observed until the engine was between 150 and 175 yards of him and that the train could not be stopped within this distance. We are asked to answer this question: "Must trains in South Carolina, and in the nation, travel so slowly that they can be stopped within the visual range of the headlights?" No categorical answer can be given to this question. An unqualified affirmative answer would have the effect of almost paralyzing railroad transportation at night. On the other hand, the attendant circumstances might be such as to warrant an inference of negligence from operating a train at a rate of speed that will prevent its being stopped within the distance covered by its lights, in time to avoid injury to persons on the track. Stated differently, a rate of speed that would be entirely safe under some conditions may be recklessly dangerous under other conditions. It is sufficient to say that under the circumstances presented in this case the fact that the train in question was being operated at such speed that it could not be stopped within the distance illuminated by its headlight does not permit an inference of negligence.

In 75 C. J. S., Railroads, § 911, page 313, it is stated: "The reasonableness of the speed must be determined in view of the physical characteristics of the locus in question and with due regard to the number of persons ordinarily to be found either on, or in proximity to, the railroad location. The railroad is not required to operate a train at such a speed that the train can be stopped under all circumstances to prevent an accident if an emergency occurs; nor is it required to operate a train in sparsely settled regions in the nighttime at such a speed that the train can be stopped within

the range of the headlight. Running at an unreasonable speed at a place where persons on the track are to be reasonably anticipated is negligence for which the company may be held liable to a person injured thereby." Also, see annotation in 154 A. L. R., page 212.

Our attention is called to a line of cases holding that the fact that evidence is not contradicted does not have the effect of making it undisputed, as there still remains the question of the credibility of the witnesses or their interest in the result. *Johnson v. Atlantic Coast Line Railroad Co.,* 217 S. C. 190, 60 S. E. (2d) 226, and cases therein cited. But this rule is of no aid to plaintiff. If all the testimony offered by the defendant is disregarded, there is still a failure of proof of negligence. In oral argument counsel for plaintiff referred to the difficulty of obtaining testimong in this type of case, but "the difficulty of proof does not relieve plaintiff of the burden of proof". *Brock v. Carolina Scenic Stages,* 219 S. C. 360, 65 S. E. (2d) 468, 470. Of interest in this connection is the recent case of *Brissie v. Southern Railway Co.,* 209 S. C. 503, 41 S. E. (2d) 97. This was an action to recover damages for the alleged wrongful death of a person killed by a train while sitting on or near the track. It was alleged that the train, with insufficient headlights, was being operated at a reckless rate of speed and without proper lookout, and that the railroad company failed to give notice or warning of its approach. At the conclusion of the plaintiff's testimony, the Court refused defendant's motion for a nonsuit, whereupon counsel for the defendant stated that he did not care to offer any testimony. Counsel for plaintiff, apparently being doubtful of his proof, then asked for permission to reopen the case. This was granted and the plaintiff offered two additional witnesses, one of whom was the engineer in charge of the train. The testimony of the engineer, which was uncontradicted, showed due care. We held that the Court below erred in refusing a motion for directed verdict.

We have carefully examined the cases of *Key v. Charleston & W. C. R. Co.,* 144 S. C. 164, 142 S. E. 336; *Woodward v. Southern Railway,* 90 S. C. 262, 73 S. E. 79; *Leppard v. Southern Railway Co.,* 174 S. C. 237, 177 S. E. 129, relied on by plaintiff, as well as the recent case of *Jones v. Atlanta-Charlotte Air Line R. Co.,* 218 S. C. 537, 63 S. E. (2d) 476, none of which, we think, conflicts with the conclusion herein reached. In the *Woodward case* the train was running on a dark night without a headlight and the crossing signals were not given. The other cases involved persons killed by the railroad company while lying or sitting upon the railroad track and in each of them the plaintiff offered proof that those in charge of the operation of the train failed to exercise ordinary care to avoid injuring a person seen in a helpless condition on the track, or who should have been seen by the exercise of reasonable diligence in keeping a proper lookout. Here there is no such proof. In the *Key case* there was the additional circumstance that the headlight was "dim".

Having reached the conclusion there was no proof of actionable negligence on the part of the defendant, we do not reach the issue of contributory negligence, which is also raised by the exceptions.

The judgment appealed from is reversed and the case is remanded for entry of judgment in favor of defendant in accordance with Rule 27.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.