**Phyllis WAY, Administratrix of the Estate of Myers Way, Plaintiff,**

v.

**SEABOARD AIR LINE RAILROAD COMPANY, a corporation, Defendant.**

**Civ. A. No. 66–588.**

United States District Court
D. South Carolina,
Orangeburg Division.

July 12, 1967.

Ernest A. Finney, Jr., Finney & Gray, Sumter, S. C., for plaintiff.

H. Simmons Tate, Jr., Boyd, Bruton, Knowlton & Tate, Columbia, S. C., William A. Horger, Horger & Horger, Orangeburg, S. C., for defendant.

## ORDER

SIMONS, District Judge.

This is a wrongful death action brought under the laws of South Carolina for the alleged wrongful death of Myers Way as a result of his being struck and killed by defendant's train on March 10, 1965 near North, South Carolina.

Plaintiff in her complaint contends that defendant through its agents was guilty of negligence and wilfulness in striking plaintiff's deceased while he was "either walking along said track or right-of-way, or was endeavoring to cross at a proper and existing crossing or otherwise upon said track or right-of-way. * * *" Plaintiff alleges, as specifications of negligence on the part of defendant, excessive speed, failure to keep a proper lookout, failure to give appropriate warning signals, and failure to slacken speed or apply brakes when the decedent was or should have been seen.

Defendant for a first defense admits the collision but alleges that the deceased

was a trespasser at the time and otherwise denies the material allegations of the complaint. For a second defense defendant asserts that deceased was a trespasser to whom it owed no duty except that of not wilfully injuring him, and denies that it had wilfully injured the deceased. For a third defense defendant alleges that plaintiff's intestate was guilty of contributory gross negligence in sitting or lying down on defendant's tracks, knowing that trains frequently used said tracks; in being in such a physical condition that he was heedless of his own safety; in failing to remove himself from the tracks when warned by the train of its approach; and in being dressed in such a manner that he could not be seen easily.

The case was tried before me without a jury. In compliance with Rule 52(a), Federal Rules of Civil Procedure, I find the facts specially and state my conclusions of law thereon as follows:

## FINDINGS OF FACT

1. The main line of defendant runs through the Town of North in a north-south direction. The track is straight through the town with six grade crossings therein and two grade crossings south of the town before reaching the Edisto River.

2. On March 9, 1965, at approximately 11:35 p. m. defendant's passenger train, a daily New York-Florida express known as the "Silver Star", left Columbia, South Carolina proceeding in a southerly direction toward Savannah, Georgia. After leaving Columbia, the engineer tested the brakes and found them to be in good condition.

3. About fifteen hundred feet from the first crossing in the Town of North, at a point where the defendant has a "whistle board", the engineer of defendant's train turned on the automatic bell and began blowing the whistle for the first crossing. The crossings in the Town of North and south of the town are about a block apart, and the engineer, after commencing the whistle signal for the first crossing, blew the whistle almost continuously through the Town of North and over the two crossings to the south thereof. The automatic bell remained on throughout. The train was also equipped with a "Mars" or oscillating headlight, primarily for warning, and a straight-beam headlight, with a visual range of about 400–600 feet. All of this equipment was operating properly.

4. As the train approached, plaintiff's intestate, who was colored and wearing khaki-colored pants and a dark shirt, was seated on the west edge of the crossties of the railroad track at a point about one hundred and forty yards south of the southernmost crossing. At this point no paths approached or were near the railroad tracks. The closest paths were about midway between the southernmost crossing and the crossing to the north thereof. This would have been about three hundred to three hundred fifty yards away, separated from the point where the intestate was seated by the paved southernmost crossing. The terrain on each side of the railroad tracks where plaintiff's intestate was seated consisted of ditches, banks and bushes, which were not easy to traverse. There was testimony that the area was "densely populated", but more detailed evidence and a visit by the court to the scene revealed that there were only a few houses west of a dirt road paralleling the railroad track on the west and east of a paved highway paralleling the railroad track on the east, and the houses were separated from the railroad tracks by the aforementioned roads, ditches, banks and bushes. Hence, I find that the area was not densely populated.

5. As the train was proceeding south and at a point before it had reached the southernmost crossing, the engineer and the fireman saw an object about 400–600 feet away, near the edge of the tracks, west of the west rail. The speed of the train at this point was its usual speed of approximately seventy-five miles per hour, which is within the permissible operating speed set by the railroad company for this area. They testified that

they both thought the object which they sighted was a piece of wrapping paper, commonly found along the railroad tracks. The engineer kept the object in his observation, and when the train was about one hundred to one hundred fifty feet away, he realized that it was plaintiff's intestate when he raised his head and looked toward the train. Immediately the engineer applied the emergency brakes and gave repeated warning blasts of the whistle. Plaintiff's intestate made no move to get out of the way and was struck by the train on the right side of his back, knocking him about ten to fifteen feet from the track and killing him instantly.

6. The emergency brakes operating in a proper manner brought the train to a halt about a mile south of the point where plaintiff's intestate was struck. The engineer sent the fireman back to notify the rest of the train crew of the accident. The conductor, along with the baggage master and flagman, directed the backing up of the train until the body was found a short distance south of the point where plaintiff's intestate was first sighted sitting on the crossties. The conductor determined that plaintiff's intestate was dead and sent the flagman to summon a doctor and the police.

7. Although there was evidence that plaintiff's intestate had been drinking, he had been seen walking about a half-hour before the accident and he looked up toward the train as it approached, so I do not find that he was in an insensible condition. There was nothing to give notice, actual or constructive, to defendant's train crew that he had been drinking.

8. It would not have been possible for the train crew to have stopped the train prior to striking plaintiff's intestate if the emergency application of brakes had been made at the moment the object was first seen on the west edge of the track. Considering its speed and making a good stop, the train could not have stopped less than approximately one mile after application of its emergency brakes.

9. At the time of his death plaintiff's deceased was about forty-four years old. He was a long-time resident of North, South Carolina, a town of about 1,000 inhabitants and lived on the northern side of town. He was survived by his wife (the administratrix of his estate), a resident of North, and one son, who was twenty years old at the time of the accident and who had lived in New York since he was sixteen years old. The intestate had not lived with his wife for about ten years. He had not supported either his wife or his son since his son moved to New York, and prior to that time he had given her only nominal sums for the boy, averaging not more than five dollars every month or two.

## CONCLUSIONS OF LAW

█ This is an action based on diversity of citizenship, and the substantive law of South Carolina applies. Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Klaxon Co. v. Stentor Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Oshiek v. Oshiek, 244 S.C. 249, 136 S.E.2d 303 (1962).

█ The law of South Carolina concerning the duty of care owed by a railroad to a person on or near its tracks is well settled. If the person is at a point where there is a well-traveled path used by the public with the knowledge and acquiescence of the railroad company for many years, he is a licensee, to whom the railroad owes the duty of ordinary care. Webb v. Atlantic Coast Line R. Co., 105 S.C. 300, 89 S.E. 546 (1916); Jones v. Charleston & W. C. Ry. Co., 61 S.C. 556, 39 S.E. 758 (1901). On the other hand, if the person is on a portion of the track where the public has not acquired the right to travel, he is a trespasser, to whom the railroad owes only a duty not to injure wilfully. Kershaw Motor Co. v. Southern Ry. Co., 136 S.C. 377, 134 S.E. 377, 47 A.L.R. 858 (1926). As the Supreme Court of South Carolina said in Smalley v.

Southern Ry. Co., 57 S.C. 243, 253, 35 S.E. 489, 492 (1900):

> " 'Properly speaking, there is no positive duty owing from a railroad company to a trespasser on its track. It is not a part of its duty, in exercising ordinary care in the operation of its road, to provide against the possibility that trespassers may be on its track, and the extent of its duty is to refrain from willful or deliberate injury.' "

As a corollary, the failure to keep a lookout for adult trespassers is ordinarily not negligence. Nettles v. Southern Ry. Co., 211 S.C. 187, 44 S.E.2d 321 (1947). Such duty as there is toward a trespasser arises from a negative obligation not to treat him "without some regard to the dictates of humanity." Brissie v. Southern Ry. Co., 209 S.C. 503, 507, 41 S.E. 2d 97, 99 (1947).

■ Although the complaint alleges that plaintiff's intestate was walking along or crossing the track at an existing crossing, the overwhelming weight of the evidence established that he was seated at the western edge of the rail at a point far distant from any crossing or path. Applying the well-settled law, I therefore conclude that he was a trespasser, not a licensee. Thus, in order to recover, the plaintiff must prove that defendant was guilty of a wilful or deliberate act or omission resulting proximately in the intestate's death.

First plaintiff contends that the train's speed was excessive and reckless, and in connection therewith plaintiff argues that to operate a train at such a speed that it could not be stopped within the visual range of its headlamp constituted negligence. Other jurisdictions have rejected this argument. Marquis v. St. Louis-S. F. Ry. Co., 234 A.C.A. 400, 44 Cal.Rpts. 367 (Cal.App.1965); Johnson v. Killion, 179 Kan. 571, 297 P.2d 177 (Kan. 1956). This question was raised in South Carolina in Williamson v. Charleston & W. C. R. Co., 222 S.C. 455,

461, 73 S.E.2d 537, 539 (1952), where the court held:

> "We are asked to answer this question: 'Must trains in South Carolina, and in the nation, travel so slowly that they can be stopped within the visual range of the headlights?' No categorical answer can be given to this question. An unqualified affirmative answer would have the effect of almost paralyzing railroad transportation at night."

* * * * * *

> "In 75 C.J.S. Railroads § 911, page 313, it is stated: 'The reasonableness of the speed must be determined in view of the physical characteristics of the locus in question and with due regard to the number of persons ordinarily to be found either on, or in proximity to, the railroad location. The railroad is not required to operate a train at such a speed that the train can be stopped under all circumstances to prevent an accident if an emergency occurs; nor is it required to operate a train in sparsely settled regions in the nighttime at such a speed that the train can be stopped within the range of the headlight.' "

■ As to the charge of excessive speed, generally no rate of speed of trains outside of municipal limits is, by itself, negligence in the absence of legislation of which there is none in South Carolina. New Orleans & N. E. R. Co. v. Phillips, 252 Miss. 438, 172 So.2d 414 (Miss.1965). A railroad has the right to use its discretion in establishing the speed of its trains. 74 C.J.S. Railroads § 744, p. 1390. The South Carolina Supreme Court, referring to a speed of 40–45 miles per hour, said that "[s]uch speed or even a much greater speed is of course not negligence in all cases * * *" but depends on all the circumstances. Melton v. Atlantic Coast Line R. Co., 206 S.C. 251, 257, 27 S.E.2d 490, 492 (1943). More particularly a railroad does not owe a duty to trespassers to operate its trains at any particular rate of speed. Ingle v. Clinchfield R. Co.,

162 Va. 131, 192 S.E. 782 (Va.1937); Hortenstein v. Virginia-Carolina R. Co., 102 Va. 914, 47 S.E. 996 (Va.1904).

 In the instant case the train was a regular high-speed express train from New York to Florida. It was traveling in accordance with a published railroad time table through a small town, on the outskirts of which there were but few houses and those separated from the tracks by roads. It was traveling late at night. The speed was within the prescribed time table limits for the area, and the train operated at approximately the same speed and time every night, a fact which it may be presumed was well known to plaintiff's intestate. It was controlled by two experienced crewmen, the engineer and fireman, who gave the statutory signals, the engine had oscillating and straight-beam headlights operating properly, which were calculated to give fair warning to anyone near the tracks. The train was equipped with efficient air brakes, and all of this equipment was operating properly. Considering all these facts and circumstances, I cannot conclude that the speed of the train constituted even simple negligence, much less wilfulness.

 Second, plaintiff claims defendant failed to keep a proper lookout. I do not find this to be true under the circumstances. The railroad had two experienced crewmen keeping continuous lookout. The accident happened at night. They first sighted an object when they were about 400–600 feet away. This is about the visual range of the straight-beam headlight; the "Mars" light is primarily for warning. They had crossed or were crossing over six crossings, so some attention had to be paid to these. Especially at night plaintiff's intestate, being colored and wearing a dark shirt, would have been hard to see, and the khaki trousers he was wearing could easily have been mistaken for pieces of brown colored paper frequently seen by the train crew along the tracks. The engineer continued to watch the object until he learned it was a man, then he applied the emergency brakes. Con-

sidering all of these circumstances, I conclude that plaintiff has failed to prove by a preponderance of the evidence that the train crew failed to keep a proper lookout.

 Third, plaintiff's complaint alleged failure to give appropriate warning signals. This was not established by the credible evidence. The automatic bell and manual whistle were ringing and being blown continuously through North; when the object was seen, additional multiple blasts were given. The headlight and "Mars" light were operating. No additional signals could have been given to someone seated where plaintiff's intestate was seated to warn of the railroad train's approach.

 Finally, plaintiff claims negligence in failing to stop or slow down. I have already concluded there was no negligence in the lookout and hence that the train crew was not guilty of wrongdoing in having failed to discover plaintiff's intestate earlier. When the crew did see that the object was a man, immediate application of brakes was made, but of course it could not stop the train in time in view of the speed. Considering the mileage over which the train travels, there must be many objects of debris occasionally collecting on or near the tracks, and it would be a practical impossibility to stop the train each time some object is seen by a member of the train crew. Such constant emergency stops would be a continuous interruption of the train's schedule and would involve considerable risk of injury to the train's passengers to whom, as a common carrier, the railroad owes the highest duty of care. As before stated, even if emergency application of brakes had been made when the object was first seen the train would not have stopped in time to avoid striking the intestate. Such diminution of speed as might have resulted would have been minimal, and whether the intestate would have moved or been struck differently or with a less-than-fatal blow is purely speculative. Hence, I find no evidence to establish

negligence in the application of the brakes.

In summary, it is established by the record that defendant exercised every reasonable precaution which it could have exercised under the circumstances. Thus, I conclude that there was no negligence on the part of the railroad even under the standard of care owed to a licensee, and *a fortiori* no wilfulness under the standard owed to the plaintiff's intestate, a trespasser.

Furthermore, it is obvious that the intestate was guilty of contributory gross negligence in being seated on a railroad line which he knew, or should have known, was much used by high speed trains regularly at that time of night. It was certainly easier for him to have seen and heard the train, with its whistle, bell and lights, than for him to have been seen by the train crew, dressed as he was. Anyone going on a railroad track, a place of danger, takes substantial risks, and it is a well settled rule that it is always train time at a railroad crossing. Robison & Atlantic Coast Line R. Co., 179 S.C. 493, 501, 184 S.E. 96, 100 (1936). The rule should apply equally to any stretch of railroad track.

Plaintiff attempts to avoid the intestate's contributory gross negligence by asserting the doctrine of last clear chance. As stated in Jones v. Atlanta-Charlotte A.L.R. Co., 218 S.C. 537, 63 S.E.2d 476, 26 A.L.R.2d 297 (1951), and more recently in Browder v. Southern Rwy., 226 S.C. 26, 35; 83 S.E.2d 455, 459 (1954):

"Under the doctrine of last clear chance, which prevails in this State, even though the deceased negligently exposed himself to a risk of danger while intoxicated or became intoxicated after a negligent exposure to danger, if he was on the track in a helpless condition and those in charge of the train discovered, or in the exercise of ordinary care should have discovered, him in such perilous situation in time to avoid injuring him by the exercise of ordinary care, the railroad company would be liable."

In order to come within this doctrine, plaintiff must show first that her intestate was intoxicated and "in a helpless condition." There was evidence that the intestate had been drinking, but no evidence that he was helpless. In fact, about half an hour before the accident he was seen walking away from a house located between the southernmost crossing and the next crossing north. When seen by the train crew he was sitting up, not lying down, at the edge of the crossties. Before being struck, he was seen to raise his head and look toward the train. Since there was no evidence of helplessness and in fact evidence to the contrary, I do not find that he was in a helpless condition.

Second, the plaintiff must show that the train crew discovered him, or reasonably should have discovered him, in such a perilous situation in time to avoid the injury. There was nothing to give the train crew actual or constructive notice that the intestate had been drinking or that he was in a helpless condition. In Southland Butane Gas Co. v. Blackwell, 211 Ga. 665, 88 S.E.2d 6 (Ga.1955), the court held that the defendant must realize or have reason to realize plaintiff's helpless condition for the doctrine of last clear chance to be applicable. "If the object seen is an intelligent human being, it seems to be generally agreed that the engineer has the right to presume that he will get out of harm's way, before the engine reaches him, and that it is not negligence to act upon that presumption." Brissie v. Southern Rwy., 209 S.C. 503, 507, 41 S.E.2d 97, 99 (1947). Cummings v. Atlantic Coast Line R. Co., 217 N.C. 127, 6 S.E.2d 837 (N.C.1940).

More important, however, the doctrine assumes that after discovery of the intestate or after he should have been discovered, there was something the train crew could have done to avoid injury. Bramlett v. Southern Rwy. Co., 234 S.C. 283, 108 S.E.2d 91 (1959). In other words, there must be railroad negligence

*after* discovery of the intestate's helplessness, or *after* he should have been discovered. As was stated in 26 A.L.R.2d 308, 340 (1952):

"The last clear chance will not apply to a person who was injured or killed while intoxicated, unless there was sufficient time after her perilous position was discovered, or should have been discovered, within which it was possible for the other party by the exercise of reasonable care to have avoided the accident."

See also the Restatement, Torts, § 479, quoted in Jones v. Atlanta-Charlotte Air Line R. Co., 218 S.C. 537, 63 S.E.2d 476, 26 A.L.R.2d 297 (1951). The Restatement takes the following position:[1]

"§ 479. Last Clear Chance: Helpless Plaintiff

"A plaintiff who has negligently subjected himself to a risk of harm from the defendant's subsequent negligence may recover for harm caused thereby if, immediately preceding the harm,

"(a) the plaintiff is unable to avoid it by the exercise of reasonable vigilance and care, and

"(b) the defendant is negligent in failing to utilize with reasonable care and competence his then existing opportunity to avoid the harm, when he

"(1) knows of the plaintiff's situation and realizes or has reason to realize the peril involved in it or

"(2) would discover the situation and thus have reason to realize the peril, if he were to exercise the vigilance which it is then his duty to the plaintiff to exercise."

"(c) thereafter is negligent in failing to utilize with reasonable care and competence his [defendant's] *then existing ability* to avoid harming the plaintiff." (Emphasis added.)

From the record I conclude that defendant did not have any "then existing ability" to avoid injury to the intestate after discovering him, nor do I find that in the exercise of reasonable care defendant should have discovered plaintiff's intestate earlier. Based upon the good emergency stop which was made, it would have been necessary for the train crew to have discovered or seen the deceased about one mile before reaching him in order to bring the train to an emergency stop, and such discovery was totally impossible. Whether the intestate would have moved or whether his injuries would have been less severe if the emergency brakes had been applied at the first moment the object was sighted by the engineer and fireman near the track in a perilous position is pure speculation.

In all of the cases applying the doctrine of last clear chance, there has been some evidence of something the train crew could have done to have avoided the injury after discovering, or having the opportunity to discover, the injured party in a perilous position, so that the factual issue as to whether the injured was entitled to the benefit of the doctrine of "last clear chance" under all the circumstances was submitted to the trier of the facts for its determination. As the trier of the facts in this case I conclude that the railroad did all it reasonably could have done under the circumstances and that it had no "last clear chance" to save plaintiff's intestate.

Most cases of this nature have been submitted to the triers of fact under a conflict of evidence. Some cases, however, have found no liability as a matter of law, and my conclusion that under the circumstances of this case the defendant is not liable is bolstered by such cases. For example, Williamson v. Charleston & W. C. R. Co., 222 S.C. 455, 73 S.E.2d 537 (1952), if anything, presented a stronger case for the plaintiff since plaintiff's intestate was a licensee. In that

---

1. In the Restatement, Torts, Second § 479, subsection (c) has been omitted, yet note section "i" of the comment thereon. The Restatement's position remains unaltered.

case the engineer saw the intestate "stooped" or "crouched" over the right rail about 150–175 yards away, applied emergency brakes, but was unable to stop because of the speed. The Court held there was no actionable negligence as a matter of law. In Brissie v. Southern Rwy. Co., 209 S.C. 503, 41 S.E.2d 97 (1947), the engineer saw the intestate about fifty feet away at night, applied emergency brakes, but because of the speed could not stop in time. The Court held that there was no liability as a matter of law. In Webb v. Atlantic Coast Line R. Co., 105 S.C. 300, 89 S.E. 546 (1916), there was a conflict of testimony and the case was submitted to the jury. But the Court, reciting the engineer's testimony (that he thought the object he saw was an old crosstie and did not realize that it was a man until within 100 yards, when it moved), said, "If that was true, there was no negligence." 105 S.C. at p. 302; 89 S.E. at p. 546.

In accordance with the foregoing findings and conclusions, it is ordered that judgment be entered for defendant.

And it is so ordered.

