Arthur Victor **BRITT**, Administrator of the Estate of Henry George White, Deceased, Plaintiff,

v.

**SEABOARD COAST LINE RAILROAD COMPANY**, formerly Seaboard Air Line Railroad Company, Defendant.
**Civ. A. No. CA/67–460.**

United States District Court
D. South Carolina,
Columbia Division.

March 12, 1968.

Rion & Britt, Columbia, S. C., for plaintiff.

H. Simmons Tate, Jr., Boyd, Bruton, Knowlton & Tate, Columbia, S. C., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

DONALD RUSSELL, District Judge.

This is an action to recover for the alleged wrongful death of Henry George White under Lord Campbell's Act (Section 10–1951, Code of Laws of South Carolina, 1962). The jurisdiction of the Court is based on diversity of citizenship between the plaintiff and the defendant; the amount in controversy is in excess of $10,000.00.

In compliance with Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon in the above cause, as follows:

### FINDINGS OF FACT

About one o'clock on the morning of August 7, 1966, a train operated by the defendant was proceeding north along the main line of the defendant railroad between Charleston, South Carolina, and Hamlet, North Carolina. After passing through the village of Centenary, South Carolina, it ran over the prostrate body of the deceased, who was lying on and parallel with one rail, on the left-hand side of the railroad, with his head to the north, at a point where such track crosses a small field road known as the Gibson farm road. The road is apparently not a public road but one used in the operation of the Gibson farm. The crossing is about 1400 feet from the railroad crossing over the main thoroughfare in the village of Centenary.

As a train approaches Centenary, a small, unincorporated village of about two hundred to three hundred inhabitants, and passes northward towards the Gibson road crossing below the village where the deceased was struck, it passes three "whistle boards". The first of these, marking the Centenary street crossing, is located some 1600 feet south of the crossing itself, the second, marking a dirt county road crossing just beyond the Gibson road crossing, at a point about 1036 feet south of the Gibson road crossing, and the final one, for the crossing over State Highway 41, is about 734 feet south of the Gibson road crossing. Under the railroad's operating rules regarding such "whistle boards", it is the duty of the engineer, as he reaches such "whistle boards", to sound repeatedly his whistle and to ring his bell continuously until he has passed over the crossing, warning of which is called for by the "whistle board". Because of the contiguity of the "whistle boards" in this case, an engineer operating a train going north would be repeatedly sounding his whistle and continuously ringing his bell from a point more than a quarter of a mile before he reached the Centenary street crossing to the Gibson farm road crossing and beyond.

Between the main street crossing in Centenary and the Gibson road crossing, the rail line is straight.

There is a fairly regular schedule of night trains operating on this railroad line between Charleston and Hamlet. The residents of the Centenary community, including all the adult members of the deceased's family, were reasonably acquainted with the schedules of such night trains. One of these trains, which

normally moved northward over this line, came through Centenary at about 1:00 a. m. and was the train which struck the deceased.

On the night of August 6, 1966, this one o'clock train was under the control of Engineer Barlow. Prior to leaving the Charleston Yards he had tested the brakes and lights on his train and found both in good order. As he approached within about a quarter of a mile of the crossing over the main street of Centenary and as he passed the "whistle board" at that point, he testified he began to blow his whistle and set his automatic bell to ringing and continued to do so until after he had hit the deceased. This testimony of Engineer Barlow was corroborated by the Brakeman Carter, who was riding in the engine cab with Barlow. Any testimony offered by the plaintiff to the effect that the statutory signals were not given by the defendant as its train passed through Centenary and approached the Gibson farm road is vague and indefinite. Typical of such testimony was that of the deceased's mother-in-law. She had retired for the night, was on the opposite side of house from the railroad line, and was better

than a third of a mile from the train when it crossed the main street of Centenary. She merely testified that she did not hear the whistle or the bell until the screeching of the train's brakes, or its "lamentations", as the plaintiff's witnesses described it, attracted her attention and that then for the first time she heard the train's bell ringing. It is not unreasonable that she may not have noticed the train, its whistling or its bell ringing, until the screeching of the engine's emergency brakes rent the air.[1] I do not regard this testimony of the plaintiff, almost entirely negative in character, sufficient to justify my disregarding the positive and categorical testimony of Barlow and Carter, even though they may be interested witnesses, that the whistle sounded and the bell was ringing.[2] I conclude that the defendant's whistle was sounding and its bell was ringing continuously for some 2500 feet before the deceased was hit.

The train involved in this accident was, according to the undisputed testimony, traveling at a speed of about 40 miles per hour as it passed through Centenary and approached the Gibson farm road. Such speed was reasonable under all the circumstances. The train consisted of

---

1. This is especially true, since she was not specially listening for the train or specially attentive to whether its whistle was sounding or its bell ringing.

2. See, in this connection, Kilmer v. Norfolk & W. Ry. Co. (C.C.A.W.Va., 1930) 45 F.2d 532, 535, cert. denied 283 U.S. 824, 51 S.Ct. 347, 75 L.Ed. 1438; Gulf, M. & O. R. Co. v. Freund (C.C.A.Ill., 1950) 183 F.2d 1005, 1010, 21 A.L.R.2d 729, cert. denied 340 U.S. 904, 71 S.Ct. 280, 95 L.Ed. 654; Strider v. Pennsylvania R. Co. (C.C.A.Ohio, 1932) 60 F.2d 237, 239; Annotation, 162 A.L.R. 1. Thus, in White v. Southern Ry. Co. (1928) 151 Va. 302, 144 S.E. 424, 427, the Court observed: " 'The testimony of witnesses that they did not hear the bell or whistle of a locomotive as it approached a crossing, without proof that the witnesses listened for the signal, or that their attention was in any way directed to it, or that they probably must have heard it, if it did sound, cannot prevail against the positive testimony of other credible witnesses that the signal

was sounded at the time in question. * * * ' " It is true that a number of South Carolina cases do hold that such negative testimony is sufficient to withstand a motion for a direction of verdict on that issue (Carter v. Atlantic Coast Line R. Co. et al. (1940) 192 S.C. 441, 449, 7 S.E.2d 163; Smith v. Southern Railroad Co. (1945) 207 S.C. 179, 189, 35 S.E.2d 225; Callison v. Charleston & W. C. Ry. Co. (1916) 106 S.C. 123, 130, 90 S.E. 260) ; but the point here is not whether there is a factual issue (which is all that was involved in the South Carolina cases) but how to resolve such factual issue in the face of conflicting direct and negative testimony. Westley v. Southern Ry. Co. (C.C.A.S.C., 1957) 250 F.2d 188, 191. In the resolution of such factual issue, it seems clear from the cited authorities that, unless the negative testimony carries some special attachment of reliability, its weight, as opposed to direct and positive testimony to the contrary, is not very compelling.

three engines and 125 box cars, of which all but thirty were empty. According to the expert testimony, such train, traveling at its undisputed speed and pulling its admitted load, required about 1475 feet within which to stop after the application of its emergency brakes. It actually stopped within a few feet less than 1450 feet after the emergency brakes were applied.

The train was equipped with two direct-beam lights. The witnesses for the defendant fixed the outermost reach of such lights as about 800 feet. Some of the plaintiff's witnesses indicated that such lights pierced forward for more than the distance estimated by defendant's witnesses. However, no one of plaintiff's witnesses was giving more than a broad guess based on very general observation. I cannot believe that any one of these witnesses ever attempted to fix definitely by observation the distance forward these train lights illuminated with clearness. It is possible, of course, looking towards a light, to see it for a great distance farther than the lights themselves will provide clear vision forward. A common experience in this regard is the observation of a lighted car at night. On a straight stretch, such lights can be observed at night for a mile or more but the actual range of forward clear vision afforded by such lights to the driver of the car is often far less than a tenth of a mile. In my judgment, the testimony of plaintiff's witnesses, as they attempt to fix the forward range of the train's headlights, confuse these two situations. It may well be that one standing on the railroad right-of-way could discern the headlights of the train a mile away as the train came towards him but, on the other hand, the engineer on the train would have a range of vision forward, as a result of the headlights, of no more than 800 feet. I find that the extreme range of forward vision, made available to the engineer, by the headlights of the engine in this case was no more than 800 feet.[3] This range, however, would not give the engineer or the brakeman riding with him necessarily a clear and definite view of every object on the railroad roadbed at such distance. To discern and identify clearly an object on such roadbed could well require a considerably closer view.

There was a path about 2 or 3 feet east of the track itself along which persons wishing to walk from Centenary proper down to any of the houses located below the Gibson farm could travel. The use of such path by pedestrians, to the knowledge of the defendant is established. However, the defendant minimizes the use of such path. It points out that, apart from the Gibson house itself (the occupants of which, it seems conceded, never used the path) there are only two houses beyond, to which persons would likely travel by this path from Centenary. One of these homes was occupied by the deceased. Considering the population of Centenary and the sparsely settled area about the Gibson road crossing, it would seem that the traffic along this path was quite limited and confined to persons who were well acquainted with the train schedules along the rail line.

Moreover, the path used was sufficiently distant from the track to permit trains to pass without injury to persons walking along the path. The deceased's mother-in-law, who was a long-time resident in the community, fully corroborated this fact. The plaintiff offered testimony, however, that at night, persons walking along the railroad preferred to walk between the rails because of fear of snakes along the sides of the right-of-way.

On the day preceding the death of the intestate, plaintiff offered evidence to indicate that the intestate had been drinking and that he continued to drink intermittently during the day and the

3. It may be noted that in Way v. Seaboard Air Line R. Co. (D.C.S.C.1967) 270 F. Supp. 440, which apparently involved headlights similar to those here, the range of such lights was found to be less than that found here.

night before he was hit by the train. His widow testified that he bought in the morning a half-pint of whiskey, which he drank. On the other hand, a companion who saw him later and rode about with him, said that he could not detect any indications of drinking by the deceased. Another witness, who told of seeing him in the late afternoon drink a beer, denied he was drunk and described his actions as normal. The operator of a beer and liquor "joint" where the deceased spent some part of the evening before he went by his aunt's home just before the accident, testified that he did not sell the deceased any beer or liquor. The persons who accompanied the deceased from the "joint" to his aunt's home, did not regard the deceased as "drunk". When he came by his aunt's home about an hour before the train passed over his body, his aunt, who, it is true did not see him but did talk to him, stated that she did not regard him as drunk and, from his conversation, concluded he was reasonably clear-minded. An uncle, also present, talked to the deceased and stated that the deceased was not drunk and walked straight. From all the evidence, I conclude that the deceased had been drinking during the day and evening but that he was not incapacitated, either physically or mentally, by drink. I find that the testimony of the last companion to see him, the witness LeGette, accurately described his condition: He was not drunk and he could walk but he was "drowsy".

There is no explanation in the record how the deceased happened to be lying alongside the left rail (going north) of the railroad track at the Gibson farm crossing. The theory of the plaintiff is that, while incapacitated from drink he lay down on the track and went to sleep. His wife testified that when drinking, he had a tendency to want to go to sleep, especially if he sat down. This, coupled with the testimony of the witness LeGette, suggests that he may have, as he walked down the railroad tracks, stopped, sat down for a moment, and being under the influence of whiskey, though not drunk, fell unconsciously off to sleep. This conclusion fits in with his widow's testimony of his habits. This seems about the most reasonable explanation under all the circumstances.

The deceased was of dark complexion and he wore dark trousers, a white shirt, red socks and tennis shoes at the time he was hit. On the other hand, his position prone on the tracks and parallel to the rail itself, did not stand out at night and would have been difficult to see for any substantial distance down the tracks, even though the tracks had been illuminated.

The engineer and brakeman on defendant's train testified that, while maintaining a careful watch passing by Centenary, they did not observe anything about the crossing at the Gibson farm road crossing until they were about 250 feet from the crossing. They emphasized that it was cloudy and the moon was obscured, a fact fully established in the record. They, also, referred to two ponds on the west side and undergrowth and low-lying land on the east side of the railroad at such crossing and testified that because of this hazy conditions were often created about the crossing. There seems no reason to question the accuracy of the testimony of Barlow and Carter that they were some 250 feet before they were able to observe an object on the track at the Gibson farm crossing. At first, they stated, they thought it was perhaps a large piece of paper and that it was not until the train was within 100 to 150 feet of the crossing that they recognized it as a person. Immediately on recognizing that it was a man on the track, the brakeman applied the emergency brakes but to no avail. It took the train over 1400 feet within which to stop after the application of the emergency brakes. Obviously, after discovering the deceased, the defendant could not, by the exercise of any degree of care, have avoided running over the deceased.

The record is undisputed that the lights on the engine were in good order and that the brakes were working

satisfactorily. I have, also, concluded that the statutory signals were given for the several crossings and that the whistle was blown and the bell rung for about 2500 feet before the train struck the deceased.

At the time of his death the deceased was 26 years of age. His only beneficiary under Lord Campbell's Act is his widow, who has since remarried. Under the South Carolina mortuary tables, he had, at the time of his death, a life expectancy of 44.90 years.

## CONCLUSIONS OF LAW

The presence of a recognized path along the track of the defendant near the point where the deceased was struck, along which persons were accustomed to walk with the defendant's acquiescence, is sufficient to fix the status of the deceased as a licensee at the time of the accident. That he was lying on the track, rather than walking on the path, will not alter his status as a licensee. In Miller v. Atlantic Coast Line R. Co. et al. (1954) 225 S.C. 217, 229, 81 S.E.2d 335, 341, the Court said:

"It is well settled in this State that a license(e) on footpaths about a railroad track does not lose his status as a licensee by virtue of sitting or lying prone upon said track adjacent to a path."

To the same effect: Hayes v. Atlantic Coast Line R. Co. et al. (1941) 196 S.C. 386, 392, 13 S.E.2d 921; Jones v. Atlanta-C. Air Line R. Co. et al. (1951) 218 S.C. 537, 548, 63 S.E.2d 476, 26 A.L.R.2d 297. This conclusion that the deceased's status was that of a licensee is reinforced by the circumstance that he was actually lying on the track at a crossing—not a public crossing perhaps, but, though private, one known to the defendant.

■■ The duty owed by a railroad to a licensee on its track is that of ordinary care to avoid injuring him. Gibbs v. Atlantic Coast Line R. Co. et al. (1952) 221 S.C. 243, 248, 70 S.E.2d 238; Jones v. Charleston & W. C. Railway Company

(1901) 61 S.C. 556, 562, 39 S.E. 758. The degree of such care, however, must depend on the circumstances of the particular case. Williamson v. Charleston & W. C. R. Co. (1952) 222 S.C. 455, 463, 73 S.E.2d 537. Though plaintiff offered some negative testimony that the statutory signals were not given, the record supports the conclusion that such signals were given. The real gravamen of plaintiff's claim of want of ordinary care concerns the speed of defendant's train. He contends that the operation of a train at such a speed that the train cannot be stopped within the effective range of its headlights is excessive. As Judge Simons, in his able opinion in Way v. Seaboard Air Line R. Co. (D.C.S.C.1967) 270 F.Supp. 440, 444–445, points out, this is not the law of South Carolina and does not find support in the decisions of other jurisdictions. Owens v. Chicago, Rock Island and Pacific Railroad Co. (10 Cir., 1961) 292 F.2d 696, 697. As the Court said in Melton v. Atlantic Coast Line R. Co. (1943) 206 S.C. 251, 257, 27 S.E.2d 490, 492 " * * * the rate of speed to be used in a particular case depends upon the nature of the crossing and other circumstances shown by the evidence." And the specific question raised by the plaintiff was answered in the *Williamson Case*, where the Court said:

"We are asked to answer this question: 'Must trains in South Carolina, and in the nation, travel so slowly that they can be stopped within the visual range of the headlights?' No categorical answer can be given to this question. An unqualified affirmative answer would have the effect of almost paralyzing railroad transportation at night. * * * The railroad is not required to operate a train at such a speed that the train can be stopped under all circumstances to prevent an accident if an emergency occurs; nor is it required to operate a train in sparsely settled regions in the nighttime at such a speed that the train can be stopped within the range of the headlight.

* * * "

The facts in this case are singularly similar to those in the *Williamson* Case, where the Court held that there was no evidence of negligence as a matter of law. There, as here, the deceased was struck at night by a train while apparently lying in an unconscious condition on the tracks of the railroad about 30 yards from a neighborhood crossing through the village of Bush's Station, where a "good many Colored people" and "one (white) family" lived. The Court held there was sufficient evidence to warrant the "inference that the deceased was a licensee". The train was being operated at a speed of "about 45 miles an hour". The engineer testified that he did not see the deceased on the track until he was between 150 and 175 yards of the deceased, that it was impossible with the lights of the train to see anyone on the tracks at a greater distance and that a train, traveling at the speed of 45 miles an hour, could not have been stopped in that distance. On such evidence, which, as I have said, is strikingly similar to that in this case, the Court held unanimously that the evidence was not such as to require the submission of the issue of negligence to the jury.

Way v. Seaboard Air Line R. Co., supra, seems equally in point. It is true that the Court found that the deceased in that case was a trespasser but it concluded that "there was no negligence on the part of the railroad *even under the standard of care owed to a licensee,* (italics added) and *a fortiori* no wilfulness under the standard owed to the plaintiff's intestate, a trespasser." (270 F.Supp. 446).

■■ Here the defendant's train was being operated at a reasonable rate of speed under the circumstances, its employees were maintaining a proper lookout, the train's brakes and headlights were operating properly and it had given the statutory signals. On such facts there can be no finding of negligence on the part of the defendant.

■■ Moreover, it cannot be disputed that the deceased was guilty of gross negligence on his part, which, if the defendant had been negligent, would bar recovery herein. But, while conceding that the deceased was guilty of gross negligence in going to sleep on defendant's track, the plaintiff basically contends that the subsequent negligence of the defendant in failing, after it discovered or should have discovered the deceased in his perilous condition, to stop its train before hitting the deceased will sustain his right of recovery herein under the "last clear chance" doctrine. The "last clear chance" doctrine is well settled and has often been applied in this State. Jones v. Atlanta-C. Air Line R. Co. et al. (1951) 218 S.C. 537 63 S.E. 2d 476, 26 A.L.R.2d 297; Seay v. Southern Ry.-Carolina Div. (1944) 205 S.C. 162, 31 S.E.2d 133; Nettles v. Southern Ry. Co., (1947) 211 S.C. 187, 44 S.E.2d 321. The necessary elements for the application of such doctrine were set forth in Jones v. Atlanta-C. Air Line R. Co. et al., supra. Without reviewing all these elements, it is sufficient for our purposes to consider the third element as stated in the *Jones* Case (p. 548, 218 S.C., p. 480, 63 S.E.2d), i. e., that the defendant, after the discoverable peril of the deceased, "thereafter is negligent in failing to utilize with reasonable care and competence his then existing ability to avoid harming the plaintiff (deceased)." This same principle was summarized in the annotation in 26 A.L.R. 2d p. 340, in the annotation to the *Jones* Case, thus:

"There appears to be no dissent from the proposition that whether or not there is a duty to be on the lookout at the time and place of the accident, if an intoxicated trespasser is actually discovered in a helpless state of peril in time to avoid injuring or killing him, there is a duty to use reasonable care to avert harming him, and for failure to use such care one will be liable for his injuries or death under the last clear chance doctrine."

■ It is clear from the testimony in this case that this essential element is not present in this case. Whether it be

considered that the defendant should have discovered the deceased within the furthermost range of its headlights (i. e., 800 feet) or within the distance its employees state that, in the exercise of a proper lookout, they could discern an object on the crossing (i. e., 250 feet) or the point where they first recognize the object as a human being (i. e., 150 feet), the undisputed fact is that the train, pulling 125 freight cars and traveling at 40 miles an hour, could not have stopped in time to avoid hitting the deceased. At least 1400 feet were required for stopping the train.[4] Such circumstances forecloses any reliance by plaintiff on the "last clear chance" doctrine, unless the speed of the defendant's train was excessive. See, Graham v. Seaboard Air Line R. Co. (D.C.S.C.1966) 250 F.Supp. 566, 574. I have already found that such speed was not excessive under the circumstances. Accordingly, plaintiff cannot avail himself of the "last clear chance" doctrine.

Let judgment be entered in faver of the defendant, and

It is so ordered.

---

4. In the *Jones* Case, supra, on which plaintiff relies, the Court pointedly observed that, "No one estimated in evidence the distance required to stop the train in emergency." (218 S.C. at p. 543, 63 S.E. 2d at p. 478).